LEMMON, Judge.
This suit by citizens of and landowners in Consolidated Drainage District No. 1 basically questions the validity of a decision of *854 the Jefferson Parish Council to abandon the pumping station phase of a hurricane protection-drainage project, that was 80% completed with funds derived from a bond issue, and to complete the project with the installation of floodgates. The Parish of Jefferson has appealed from a judgment granting a final injunction after a trial on the merits. The judgment of the trial court perpetuated the preliminary injunction ordered by this court (352 So.2d 297) and ordered the Parish to proceed with construction of the pumping station at Bayou Aux Carpes.
I
The detailed facts outlined in this court’s previous opinion are accepted for purposes of this decision (except for the statement that so-called environmental groups offered on October 7, 1976 to withdraw their opposition to the Lafitte-Larose Highway in exchange for the Parish’s abandoning the Bayou Aux Carpes pumping station plan and adopting the plan to install floodgates).[1] However, the following crucial operative facts are reiterated for emphasis as the basis of this decision.
In 1961 the U.S. Army Corps of Engineers (Corps) proposed a flood control project for the west bank of Jefferson Parish. The project consisted of Phase I, the construction of levees along the Intracoas-tal Waterway (called the Harvey Canal-Bayou Barataría Levee) and the placement of dams and dikes at the mouth of Bayou Aux Carpes and at Bayou Des Families, and Phase II, the installation of a pumping station at Bayou Aux Carpes. By a 1963 resolution the Jefferson Parish Counsel approved the project and agreed to obtain the necessary servitudes, to construct the pumping station, and to furnish the Corps with other assurances of local cooperation.
In 1967 the voters of the drainage district approved a bond issue of $3,656,000 to construct a number of drainage works, including this project. Prior to the election the Council had circulated to the voters a brochure expressing the need for hurricane and flood protection and for drainage improvement and describing the projects proposed to be undertaken with funds from the bond issue. While the brochure specifically described the Harvey Canal-Bayou Barataría Levee as a “hurricane protection levee”, the pumping station was intended to provide improved drainage to the Crown Point area, and installation of levees, drainage canals and the pumping station would result in making lands currently subject to tidal overflow available for residential and industrial use.
In 1969 the Council obtained the servi-tudes for the project’s levee and drainage ditches, some of the grantors being the plaintiffs in this suit.- The servitude contract recited that the Corps had agreed to build a levee and drainage ditches and that the consideration for the servitude was “the benefits and improvements to be derived by Grantors and the enhanced value resulting to Grantors’ properties which will accrue as a result of the said Harvey Canal-Barataria Levee Project”.
Construction of Phase I was begun in 1971 and completed in 1973, at which time the entire project was 80% complete. After public bidding, the Council in 1974 let a $476,479 contract for construction and installation of the pumping station, and the contractor purchased $186,630 of materials, which were delivered to the site. Construction was halted, however, in November, 1974 when the Corps determined that the remainder of the project should be reviewed under recently published federal regulations. Although the Corps after a hearing recommended that the project be completed according to previous plans, the Environmental Protection Agency (EPA) objected *855 to the destruction of the wetlands by pumping and recommended removal of the dams and dikes, thus returning the land to natural drainage and preserving the wetlands.
The project remained at a standstill during further administrative procedures at the local and national levels until General Wilson, the Corps’ Deputy Director in Washington, in August, 1976 advised EPA that the Corps would proceed immediately to complete the planned project unless the EPA exercised its veto power. EPA asked for additional time to complete the review.
According to General Wilson, EPA hardened its position in opposition to the pumping station and stated it would invoke its veto power. He accordingly began to consider other alternatives and on October 7, 1976 set up a meeting on the site with representatives of the Council, the landowners, and civic groups concerned with environmental protection. An officer of one civic group suggested it would not oppose the project if the dams and dikes were removed and floodgates installed so as to offer hurricane protection while preserving the wetlands. Later the same day General Wilson stated privately to one councilman that if they sought to overturn an EPA veto in federal court in Washington, their legal position would be weak. While he assured the councilman that the Corps would abide by the Parish’s decision as to either alternative (pumping station of floodgates), he pointed out there would be litigation whichever way they went — a suit by the civic groups, if they attempted to construct the pumping station, or a suit by the landowners, if they attempted to install the floodgates. He further pointed out that the Corps was primarily interested in the benefits of hurricane protection, which would be the same under either alternative.[2] After discussion with other officials the councilmen reported that they would prefer to complete a hurricane protection project immediately rather than to be tied up indefinitely on the pumping station feature of a project they had been trying to complete for nine years and which then offered little prospect for completion.
General Wilson accordingly issued an order to the Corps’ local engineer directing removal of the dams and installation of the floodgates for use only during flood control conditions. This suit by the landowners followed, seeking to enjoin the Parish from expending funds from the 1967 bond issue for any purpose not included in the original project and from abandoning the project as originally authorized by the Council's 1963 resolution.
After a hearing the trial court dismissed the rule for preliminary injunction. This court reversed, holding that plaintiffs had made a showing sufficient to warrant issuance of a conservatory writ maintaining current status until the hearing on the merits of the final injunction.
On remand the trial court, after a hearing, granted the final injunction and ordered completion of the pumping station. The Parish then appealed.
II
The Council, after representing to the voters that the bond issue funds would be used to construct a pumping station as part of a drainage improvement project, could not arbitrarily change the project to install floodgates which offered no improvement to drainage (but did offer the same degree of hurricane protection). This appeal essentially turns on the question of whether the Council’s decision to make the change was reached arbitrarily, without reasonable basis.[3]
We hold that although the members of the Council acted in good faith, they could not base their abandonment of a key portion of the project, represented to the voters as the intended use of the bond issue *856 funds, on the hearsay statement that EPA would veto construction of the pumping station.
Admittedly, the Council (and its predecessor group) had diligently attempted to complete Phase II from the time Phase I was completed in 1973 until the alternative project was proposed in late 1976. Besides experiencing the frustration of delay, the Council had been informed that attempted construction of the pumping station would provoke an immediate EPA veto, which was unlikely to be overturned in litigation, and would also be met with injunctive action by civil groups that would certainly cause additional delay and would probably result in an unfavorable decision. Under the circumstances the decision to proceed to immediate completion with floodgates, even though damage claims would probably be presented by the pumping station contractor [4] and the landowners who granted servi-tudes can hardly be said to be based on improper motives. Nevertheless, the fact that the Council had represented to voters that the pumping station would be built as part of the project funded by the bond issue requires the holding that the pumping station construction cannot be abandoned merely on threat of stoppage by federal authority, but must be continued until the authority with supremacy exercises that power (which has never been used previously in any case).[5] Abandonment based on hearsay cannot be approved, and the citizens of the drainage district are entitled to injunctive relief.[6]
Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.

. In reasons for judgment rendered after the hearing on the final injunction the trial court expressly found as a fact that there was no such offer of compromise. The record clearly supports this finding. Indeed, these groups filed a suit to stop construction of the highway long after October 7, 1976, and that suit was ultimately settled when the state highway department (not the Parish) agreed to modify certain features of the highway objected to by these groups.

. Of course, deletion of the pumping station and installation of floodgates would eliminate the land reclamation feature of the project.

. If the Council had decided to change the project to one with floodgates in exchange for the promise by environmental groups to withdraw opposition to an unrelated highway project, such a decision would clearly be subject to attack as an unreasonable abandonment of the original project.

. A breach of contract suit by the contractor has now been compromised.

. This is not to say that the Council must attempt to overturn a veto, despite competent advice of the unlikelihood of success. But the Council must proceed at least to the point of veto.

. Thus, we do not reach the issue of whether plaintiffs are entitled to injunctive relief as grantors of servitudes or defendants’ contention that damages in this respect caused by abandonment of the project can be compensated in money and are not a basis for injunction.