Jacques J. CREPPEL, et al., Plaintiffs,

v.

The UNITED STATES, Defendant,

Harold L. MOLAISON, et al., Plaintiffs,

v.

The UNITED STATES, Defendant,

MARRERO LAND & IMPROVEMENT ASSN., LTD., Plaintiff,

v.

The UNITED STATES, Defendant,

Lloyd James DRACHENBERG, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 91–1262L, 91–1505L, 91–1508L and 91–1509L.

United States Court of Federal Claims.

Jan. 18, 1994.

David C. Loeb and Harold E. Molaison, Gretna, LA, for plaintiffs.

Marc A. Smith, Washington, DC, with whom was Acting Asst. Atty. Gen. Lois J. Schiffer, for defendant.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on defendant's motion for summary judgment or, in the alternative, for partial summary judgment. The issue to be decided is whether plaintiffs timely have filed their complaints alleging unlawful takings of their properties stemming from government action under the Clean Water Act, 33 U.S.C. §§ 1251–1387 (1988).

## FACTS

The following facts are undisputed, unless otherwise noted. Plaintiffs are owners of property in an area known as the Bayou aux Carpes site, a 3,200–acre tract located in Jefferson Parish, Louisiana ("Jefferson Par-

ish"). Prior to initiation of the project at issue in this lawsuit, the site was unlevied and undrained. The United States Environmental Protection Agency ("EPA") considers approximately 3,000 of the 3,200 acres at the site to be wetlands as defined in 40 C.F.R. § 230.3(t) (1992).

The U.S. Army Corps of Engineers (the "Corps") first proposed the Harvey Canal—Bayou Barataria Levee Project (the "Project") as a flood control project in 1961. The Corps approved the Project in January 1964 with provisions for levying and draining the entire Bayou aux Carpes site. While defendant claims that the primary purpose of the Project was flood protection, plaintiffs claim that an equal, if not more important, feature was land reclamation.[1]

In 1967 voters in the drainage area approved a bond issue of $3,600,000.00 to be used to construct the Project and a number of associated drainage works. In 1969 the Jefferson Parish Council obtained the servitudes necessary for the Project in consideration for "the benefits and improvements to be derived by Grantors and the enhanced value resulting to Grantors' properties which will accrue as a result of the said Harvey Canal–Barataria Levee Project." *Creppel v. Parish of Jefferson*, 384 So.2d 853, 854 (La. Ct.App.), *cert. denied*, 392 So.2d 689 (La. 1980).

Project construction was to be completed in two stages: Phase I, consisting primarily of construction of the levees; and Phase II, the installation of the pumping station at the Bayou aux Carpes site. *Creppel*, 384 So.2d at 854. Phase I construction was completed in 1973, rendering the Project 80 percent complete. At this point all federal funds available for the Project were expended. Jefferson Parish was to finance and complete the remaining work—the installation of the pumping station and the closure of the levy. The contract for construction of the pumping station was let in 1974.

---

1. The EPA's Final Determination notes that "[i]t was initially contemplated that the Levee Project would provide flood protection and land reclamation benefits in the area; land reclamation would be achieved through drainage, by the pumping station of the 3000 acres of wetlands enclosed by the levees." Final Determination of the U.S. Environmental Protection Agency's Assistant Administrator for External Affairs Concerning the Bayou aux Carpes Site in Jefferson Louisiana Pursuant to Section 404(c) of the Clean Water Act, dated October 16, 1985, at 3.

Because the construction of the levies involved the use of fill material, the Project fell under the permit requirement of section 404(a) of the Clean Water Act, 33 U.S.C. § 1344 (the "CWA"). On February 18, 1974, Jefferson Parish applied for a section 404 permit to install the pumping station and to close the levee using dredge material pursuant to an interim Corps regulation. The Corps returned this permit application before final action was taken on it following promulgation of the final regulation on April 3, 1974, which specifically excluded Corps civil works projects from the permit requirement.

The Corps halted construction on the Project in November of 1974 in order to conduct a public hearing and public interest review of the Project required by section 404. At that point $1,000,000.00 in federal funds and approximately $3 million in local funds had been expended on the Project. Section 404(c) of the CWA allows EPA to override any Corps decision to issue a dredge or fill permit if the Administrator of EPA

> determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas ..., wildlife, or recreational areas.

33 U.S.C. § 1344(c). Thus, even though the Corps may approve a project under section 404(a), EPA still has the option of vetoing the Corps decision under its section 404(c) power.

Although the Corps eventually decided to proceed with the Project, EPA objected to the destruction of wetlands that would result from drainage of the area. By letter dated April 25, 1975, EPA Region VI objected to the Corps' Statement of Findings, stating that

> the permanent blocking of Bayou des Familles and Bayou aux Carpes and the subsequent draining of the area enclosed by the ring levee would result in the irretrievable loss of wetlands, have an unacceptable adverse impact on wildlife and recreational areas, and not be in the public interest.

Final Determination of the U.S. Environmental Protection Agency's Assistant Administrator for External Affairs Concerning the Bayou aux Carpes Site in Jefferson Louisiana Pursuant to Section 404(c) of the Clean Water Act, dated October 16, 1985, at 4 (the "EPA Final Determination"). The Corps resisted EPA's opposition, however, citing frustration of the Project's land reclamation benefits and the refusal of Jefferson Parish to finance the modified Project. During negotiations that followed between EPA and the Corps, Brigadier General Drake Wilson, Deputy Director of Civil Works, continued to press his opinion that the Project should be completed as originally planned. EPA again registered its opposition, although it did not initiate a section 404(c) action. After a meeting between the Corps and EPA in August 1976, EPA's opposition hardened though, with EPA indicating that it would exercise its section 404(c) veto power if the Project was not changed to eliminate destruction of the wetlands.

In response to EPA's opposition, General Wilson conducted a site visit and met with representatives of Jefferson Parish, EPA, property owners, environmental organizations, and members of the concerned public on October 7, 1976. The General pointed out to a Jefferson Parish councilman that there would be litigation regardless of the decision that was eventually made, either "a suit by the civic groups, if they attempted to construct the pumping station, or a suit by the landowners, if they attempted to install the floodgates." *Creppel,* 384 So.2d at 855. Concerned that construction of the pumping station would provoke an immediate EPA veto, General Wilson reversed his position and issued an order on November 16, 1976, revising the Project to reflect a compromise between the need to protect wetlands and the need to provide protection from flooding.

The "Wilson Order" provided for completion of the flood control dikes, but replaced the pumping station with movable flood gates. With the pumping station removed from the Project, the land reclamation benefits of the Project were eliminated, leaving only the flood control benefits. The order explained that these changes were made in exchange for EPA's and local environmental groups' assurances that they would drop their opposition to the Project. Completion

of the revised Project was to be performed by Jefferson Parish because federal funds for the Project had been exhausted. General Wilson had noted in his Statement on Revised Statement of Findings dated November 16, 1976, that "EPA continues to object to the Project as originally designed after many discussions and site visits." EPA concurred with the decision, thus eliminating the threat of a 404(c) veto.

At this juncture none of the plaintiff landowners had applied for a permit to fill their respective lands. No alternative land reclamation projects were undertaken. The original Project was the sole prospect for land reclamation in the the Bayou aux Carpes. Without the Project the land would remain in its original state and could not be developed. In response to this change in the Project, a number of property owners, many of them plaintiffs in the present suit, filed an action in Louisiana state court against Jefferson Parish and on January 12, 1979, obtained an order enjoining Jefferson Parish from abandoning the original Project. In 1977, while the state court action was pending, the same landowners brought suit in federal court seeking to overturn the Wilson Order.[2]

After the district court declined to overturn the Corps action, *Creppel v. United States Army Corps of Engineers*, 500 F.Supp. 1108 (E.D.La.1980), *rev'd* 670 F.2d 564 (5th Cir.1982), the Fifth Circuit remanded the case to determine if sufficient local assurances were available for completion of the modified Project and whether section 404(c) prevented completion of the Project. *Creppel v. United States Army Corps of Engineers*, 670 F.2d 564 (5th Cir.1982). On remand the district court concluded that refusal of Jefferson Parish to provide assurances of funding and cooperation to the Corps for the revised Project and the refusal of the Corps to expend further funds on it meant that upholding the modified Project would be tantamount to "commanding what

no one can obey." *Creppel v. United States Army Corps of Engineers*, Civ.Act. No. 77–25 (E.D.La. Aug. 9, 1984) (unpubl.). The court therefore ordered that the original Project should proceed. On December 14, 1984, the court stayed this order to give EPA time to decide whether it would commence section 404(c) proceedings. EPA decided to initiate section 404(c) proceedings on December 17, 1984, and, following public hearings, issued the EPA Final Determination on October 16, 1985, preventing completion of the Project.

In May 1986 the landowners sought to overturn EPA's decision by amending their prior district court complaint to add EPA as a defendant. The EPA Final Determination was upheld by the court on June 30, 1988. The case was remanded to the Corps to determine whether Jefferson Parish would grant assurances for completion of the modified Project. *Creppel v. United States Army Corps of Engineers*, 19 Envtl.L.Rep. 20134, 1988 WL 70103 (E.D.La. June 30, 1988). When such assurances were not forthcoming, the lawsuit was dismissed on October 12, 1989.

The *Creppel* plaintiffs filed suit in the United States Claims Court on July 5, 1991. The complaint was amended on August 19, 1991, to include owners of a tract of land known as the Crowell Properties. The *Molaison* plaintiffs filed suit on October 10, 1991, and were followed by both the *Drachenberg* and the *Marrero* plaintiffs on October 11, 1991. All the complaints allege a taking without just compensation stemming from the cancellation of the original Project. The *Drachenberg* complaint also asserts a claim for compensation for denial of due process.

Following a discovery period marked by long delays and little apparent progress, plaintiffs moved on April 12, 1993, to amend all four original complaints. The amendments sought to add additional property owners as plaintiffs and to add a claim for a

---

2. The landowners' suit alleged, *inter alia,* that the Wilson Order was a taking of their property without just compensation in violation of the Fifth Amendment to the United States Constitution. The suit also alleged that the Wilson Order deprived plaintiffs of contractual rights created by the servitudes granted to Jefferson Parish.

The district court denied plaintiffs' taking claim and instructed plaintiffs to pursue any implied contract claim they might have in the Court of Claims. These actions show that plaintiffs knew or were made aware of the takings claim and the possibility of suing in this court's predecessor as early as 1980.

temporary taking during the period before EPA's decision to exercise its section 404(c) veto. The motion was not accompanied by a supporting memorandum. On July 30, 1993, defendant filed an opposition to the motion, arguing that additional plaintiffs and claims were unrelated to the original actions and were barred by the statute of limitation. Defendant also moved for partial summary judgment with regard to nine plaintiffs, who allegedly did not own an interest in the subject properties during either the permanent or the temporary taking period; 16 plaintiffs, who had interests in the subject properties for only part of the taking periods; and three plaintiffs, who were unable to prove ownership of an interest in the subject properties.

Thereafter, plaintiffs filed a "motion" in support of their motion to amend complaints. In their motion plaintiffs alleged that the statute of limitations for the takings alleged in their complaints began to run only after the federal district court upheld the EPA Final Determination under section 404(c) on June 30, 1988.

In response to this filing, defendant moved to stay consideration of plaintiffs' motions to amend their complaints pending resolution of defendant's forthcoming motion for summary judgment. After oral argument the court granted defendant's motion and allowed expedited briefing on defendant's motion for summary judgment. This motion asserts that the date of the alleged taking was the date on which the Wilson Order issued: November 16, 1976. Under the six-year statute of limitations specified by 28 U.S.C.A. § 2501 (West Supp.1993), any taking claims filed by plaintiffs were required to be filed before November 16, 1982. Since all of the complaints were filed almost ten years after this date, defendant argues it is entitled to summary judgment on statute of limitations grounds.

Plaintiffs respond that the statute of limitations on the takings claims was tolled until the district court determined the validity of the EPA Final Determination. They argue that 28 U.S.C.A. § 1500 (West Supp.1993), divesting the Court of Federal Claims of jurisdiction over any suit that is substantially similar to a suit pending in a federal district court, precluded plaintiffs from simultaneously filing actions challenging EPA's decision and asking for just compensation for an unconstitutional taking. Pointing to Chief Judge Nies' dissenting opinion in *UNR Industries, Inc. v. United States*, 962 F.2d 1013 (Fed.Cir.1992), *aff'd, Keene Corp. v. United States*, —— U.S. ——, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993), plaintiffs maintain that it is unfair to force a claimant to elect between protecting the economic value of his property or seeking just compensation for the taking of the property. Thus, their decision to first pursue a reversal of the Wilson Order should not preclude plaintiffs from filing a takings claim subsequent to the exhaustion of this remedy.

Defendant rejoins that if the administrative action tolled the statute of limitations on the takings action, the statute was tolled solely with respect to those plaintiffs named in the administrative action. Defendant argues that only 17 named individuals challenged the Wilson Order, in contrast to the 100–plus claimants in the instant suit.

In *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796 (Fed.Cir.1993), the Federal Circuit held that a developer could not recover for the delay in residential development of its land caused by government regulations. The Corps had ordered plaintiff to cease development of wetlands it owned until it received a permit to do so. Citing *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126–27, 106 S.Ct. 455, 458–59, 88 L.Ed.2d 419 (1985), the appeals court held that merely requiring a permit for development did not amount to a taking. The court stated that "[a]s a matter of law, the possibility of a permit precludes the order itself from constituting a taking." *Tabb Lakes*, 10 F.3d at 801.

At the request of this court, both parties filed briefs addressing the impact of *Tabb Lakes* on the present dispute. Plaintiffs argue that the Wilson Order was not the type of preliminary regulatory activity that the Federal Circuit in *Tabb Lakes* held was not a taking. Rather, the Wilson Order modified the Project to such an extent that it deprived plaintiffs "of all use of the property." Plfs' Br. filed Dec. 21, 1993, at 2.

**328**

Asserting that *Tabb Lakes* supports dismissal of plaintiffs' claims, defendant characterizes plaintiffs' repeated assertions that their properties were undevelopable without the original Project as a fatal admission of the date of the taking. If the Wilson Order, indeed, caused plaintiffs' cause of action to accrue, their claims are time-barred. Defendant notes, in addition, that the court in *Tabb Lakes* required that a claimant concede the validity of government action that gives rise to a taking claim. Therefore, because plaintiffs did not concede the validity of the Wilson Order until their suits were filed in this court—almost 15 years later—the claims are time-barred.

## DISCUSSION

### 1. *Jurisdiction*

■ The statute of limitations is jurisdictional in the Court of Federal Claims. *Soriano v. United States,* 352 U.S. 270, 273, 77 S.Ct. 269, 271, 1 L.Ed.2d 306 (1957) (discussing this court's predecessor, the United States Court of Claims); *Hart v. United States,* 910 F.2d 815, 817, 818 (Fed.Cir.1990); *see United States v. Mottaz,* 476 U.S. 834, 841, 106 S.Ct. 2224, 2229, 90 L.Ed.2d 841 (1986). The rationale is that, in derogation of the sovereign's immunity, Congress conferred jurisdiction to entertain certain claims and that no others could be asserted against the Government, including time-barred claims. Accordingly, the statute of limitations must be strictly construed. *Kirby v. United States,* 201 Ct.Cl. 527, 539, 1973 WL 21341 (1973), *cert. denied* 417 U.S. 919, 94 S.Ct. 2626, 41 L.Ed.2d 224 (1974). In *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), the Supreme Court noted that statutes of limitations

which 'are found and approved in all systems of enlightened jurisprudence,' *Wood v. Carpenter,* 101 U.S. (11 Otto) 135, 139, 25 L.Ed. 807 (1879), represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time that 'the right to be free of stale claims time comes to prevail over the right to prosecute them.' *Railroad Telegraphers v. Railway Express Agency,* 321 U.S. 342,

349, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944). These enactments are statutes of repose; and although affording plaintiffs what the legislature deems a reasonable time to present their claims, they protect defendants and the courts from having to deal with cases in which the search for the truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise.

444 U.S. at 117, 100 S.Ct. at 356 (citing cases).

■ The statute of limitations defense is affirmative and must be pleaded. RCFC 8(c). Accordingly, the general rule is that the Government bears the burden of proof as to the statute of limitations defense, and a plaintiff has the burden of proving an exception to the statute of limitations. *Duvall v. United States,* 227 Ct.Cl. 642, 646, 652 F.2d 70 (1981); *accord Warner v. United States,* 223 Ct.Cl. 754, 755, 1980 WL 13158 (1980).

■ A motion for summary judgment based on lack of jurisdiction is treated as a motion to dismiss under RCFC 12(b)(1). *Indium Corp. of America v. Semi–Alloys, Inc.,* 781 F.2d 879, 883 (Fed.Cir.1985), *cert. denied,* 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986). When evaluating a motion to dismiss for subject matter jurisdiction pursuant to RCFC 12(b)(1), the allegations of the complaint should be construed favorably to the pleader, *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), to the end that the court must accept as true the facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988). In *W.R. Cooper General Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed.Cir.1988), the court stated: "In cases such as this in which a party has moved to dismiss for lack of jurisdiction, we must consider the facts alleged in the complaint to be correct. If these facts reveal any possible basis on which the non-movant might prevail, the motion must be denied." (Citing *Scheuer v. Rhodes,* 416 U.S. at 236, 94 S.Ct. at 1686; additional citations omitted.) However, the burden is

on a plaintiff to establish jurisdiction. *Reynolds*, 846 F.2d at 748 (citing cases).

It should be noted that this is a case asserting an alleged unconstitutional taking. The Federal Circuit has characterized such cases as "fact-intensive," cautioning against "precipitous grants of summary judgment." *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed.Cir.1983); *see also Whitney Benefits, Inc. v. United States*, 752 F.2d 1554, 1559–60 (Fed.Cir.1985), *cert. denied*, — U.S. ——, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991); *Skaw v. United States*, 740 F.2d 932, 939 (Fed.Cir.1984), *cert. denied*, 488 U.S. 854, 109 S.Ct. 141, 102 L.Ed.2d 113 (1988). The court's task is limited in reviewing the sufficiency of a complaint. The issue is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. at 236, 94 S.Ct. at 1686. In the absence of subject matter jurisdiction, the court has no authority to reach the merits, even if it is in the interest of justice to do so. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818, 108 S.Ct. 2166, 2179, 100 L.Ed.2d 811 (1988).

### 2. *Statute of limitations in takings claims*

28 U.S.C.A. § 2501 provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." Crucial to the analysis of the applicability of the statute of limitations on these cases, therefore, is the determination of the time at which plaintiffs' claims first accrued. A claim does not accrue until "all events necessary to fix the liability of a defendant have occurred—when 'the plaintiff has a legal right to maintain his or her action.'" *Catawba Indian Tribe v. United States*, 982 F.2d 1564, 1570 (Fed.Cir.1993) (quoting Corman, *Limitation of Actions*, § 6.1, p. 374 (1991)); *see MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 351, 106 S.Ct. 2561, 2567, 91 L.Ed.2d 285 (1986) (stating that the Court has uniformly insisted on determining "the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it."). The court's primary purpose, then, is to determine when plaintiffs' rights accrued to bring a takings action in the Court of Federal Claims.

### 3. *Character of the 1976 Wilson Order*

Plaintiffs have alleged both a temporary and a permanent taking. Plaintiffs contend that the temporary taking allegedly began when the 1976 Wilson Order was issued and continued up to the district court issued its decision ordering completion of the original Project on August 13, 1984. Plfs' Br. filed Apr. 12, 1993, at 7. According to plaintiffs, section 404(c) of the EPA Final Determination deprived them "of all economically beneficial use of their property." *Id.*

Plaintiffs claim that the Wilson Order resulted in a temporary taking of all economically viable use of their properties. It is evident that the act first effecting any taking of plaintiffs' properties was the modification of the original Project by the Wilson Order. At that point the expectation of land reclamation was eliminated. Plaintiffs repeatedly have admitted this in their briefs and at oral argument. Tr. of Proceedings, dated Oct. 14, 1993, at 19–20 (Wilson Order "took away our ability to use and develop our land."); Plfs' Br. filed Dec. 21, 1993, at 2 (Wilson Order's limitation of the land reclamation features "depriv[ed]" the landowners of all use of the property."); Plfs' Br. filed Aug. 13, 1993, at 4 ("[T]he Modified Project would render the Bayou Aux Carpes Site undevelopable. . . ."). No administrative appeals existed by which plaintiffs could seek to overturn the Wilson Order.

When the Wilson Order issued, plaintiffs had two options: They could concede the validity of the order and sue in the Court of Claims for a taking of their properties without just compensation, or they could act as they did and challenge the validity of the order in federal district court. By choosing to pursue their claims by a challenge to the validity of the order, plaintiffs eliminated the possibility of pursuing their claims as takings. If takings claims had been pursued, plaintiffs would have been required to admit

the validity of the Wilson Order. *Tabb Lakes*, 10 F.3d at 802 ("[C]laimant must concede the validity of the Government action which is the basis of the taking claim to bring suit under the Tucker Act...."); *see Regional Rail Reorganization Act Cases*, 419 U.S. 102, 127 n. 16, 95 S.Ct. 335, 350 n. 16, 42 L.Ed.2d 320 (1974) (Government action must be authorized, either expressly or by implication, for claims under the Tucker Act). Plaintiffs chose their remedy and pursued it to the exclusion of a takings action.

Even though plaintiffs sought to overturn the Wilson Order, the order was a final action on the part of the Corps. No further action was needed to fix the liability of the Government. The order made clear that the original Project would not be completed and that the land reclamation benefits would not occur. It either was, or should have been, clear to plaintiffs that their land would not be developable because of the Wilson Order.[3] Plaintiffs' cause of action therefore accrued when the Wilson Order issued. The statute of limitations on all claims arising from the Wilson Order began to run at the time the order was issued—not, as plaintiffs claim, when the validity of the order was finally determined by the district court. Any suit claiming an unconstitutional taking thus must have been brought before November 16, 1982—six years after the Wilson Order was issued. All of plaintiffs' complaints were filed well after this date.

■ Plaintiffs' argument that the liability of the Government was not fixed until the suits challenging the validity of the order were completed runs contrary to well-established case law. A suit challenging the validity of a government action does not toll the statute of limitations for another claim founded on the same action. *Catawba Indian Tribe*, 982 F.2d at 1570–71 (six-year statute of limitation on Indian claim not tolled by suit challenging validity of special act of Congress); *Altair Corp. v. Pesquera de Busquets*, 769 F.2d 30, 32 (1st Cir.1985) (suit challenging validity of state action did not

toll statute of limitations on 42 U.S.C. § 1983 claim).

The cases cited by plaintiffs do not support a contrary conclusion. *Donnelly v. United States*, 28 Fed.Cl. 62 (1993), and *George F. Miller Farms, Ltd. v. United States*, 27 Fed. Cl. 672 (1993), both dealt with 28 U.S.C. § 1500. In *Miller* the court allowed equitable tolling of the statute of limitations because the suit had been filed timely in the Claims Court and was stayed pending resolution of a parallel district court suit. *Donnelly* involved a suit dismissed under section 1500 and provides no support for plaintiffs' claims. Plaintiffs in the case at bar did not file suit in the Claims Court until after the statute of limitations expired and cannot claim equitable tolling based on section 1500. *New Port Largo, Inc. v. Monroe County*, 985 F.2d 1488 (11th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 439, 126 L.Ed.2d 373 (1993), and *Corn v. City of Lauderdale Lakes*, 904 F.2d 585 (11th Cir.1990), both dealt with 42 U.S.C. § 1983 actions. These cases held that the state judicial authorities had to determine the validity of the disputed regulation before a federal suit could be filed.

Plaintiffs' appeal to Chief Judge Nies' fairness argument in *UNR* similarly fails. Plaintiffs were told by a federal court as early as 1980 that the Court of Claims was the proper forum to seek compensation on their takings claim. They chose not to do so until after their district court action had failed. At that time it was too late. Had plaintiffs filed suit in this court earlier and had the suit been either suspended or dismissed, an argument for section 1500 tolling might exist. Whether their failure to file was intentional or inadvertent is irrelevant. This court must give effect to the clear mandate of the statute of limitations. Plaintiffs have shown no reason to hold otherwise.

4. *Status of properties at the time of the EPA Final Determination*

■ Plaintiffs assert that even if their claims arising from the Wilson Order are time-barred, the 1984 EPA Final Determina-

---

3. Whether a takings action would have been successful at this point is another matter. Because plaintiffs did not have a right to the benefits flowing from the project, *see Commonwealth of*

*Ky. v. United States*, 27 Fed.Cl. 173 (1992), plaintiffs' claim most likely would have failed if brought at this point.

tion was a new and separate taking of their land for which they are entitled to compensation. The EPA Final Determination was much broader in scope and more invasive than the Wilson Order. Although the Wilson Order effectively denied a permit only for the original Project, the EPA Final Determination eliminated any possibility of obtaining a permit for any filling. Plaintiffs claim that before the EPA Final Determination, each individual landowner could have reclaimed his own land by obtaining a permit to deposit fill material. According to plaintiffs, the EPA Final Determination took this right and rendered their properties permanently undevelopable.

■ This argument cannot succeed for several reasons. A regulatory taking claim cannot exist if the value of the land taking does not change under the regulation. *See Tabb Lakes,* 10 F.3d at 800. It was clear from EPA's actions during the period the Wilson Order was adopted that EPA had determined that development of the Bayou aux Carpes site would result in irreparable environmental harm. The Wilson Order was adopted only after EPA indicated that it would exercise its section 404(c) veto power if the original Project was not changed. Plaintiffs argue essentially that they were denied the right to accomplish through separate independent fill permits what the Corps hoped to accomplish through the original Project. There is no record basis to assume that EPA's concerns with the Project were centered on the particular form of the Corps activity. Rather, EPA made it abundantly clear that it wanted to maintain the Bayou aux Carpes site in its original wetlands state. It is illogical and irrational to suppose that EPA's stance would have been different if plaintiffs had tried to destroy the wetlands through individual fill permits. Thus, while the EPA Final Determination did eliminate the possibility of applying for individual permits, no value can be attached to this right since any individual fill permit was sure to be denied. Because the right to apply for an individual fill permit in the Bayou aux Carpes site was a nullity after the Wilson Order, no damage inured to plaintiffs from the denial of this possibility.

Thus, when the EPA Final Determination issued, the value of the land was identical to what it was when the Wilson Order issued. The EPA Final Determination did not diminish the value of the land any more than it had been diminished by the Wilson Order. Although a new cause of action may have accrued from EPA's action in 1984, plaintiffs suffered no injury because their land had the same value it had when the Wilson Order originally was issued in 1976.

Because plaintiffs' lawsuits were filed well beyond the six-year statute of limitations, their claims are time-barred and must be dismissed. Given the court's disposition of the statute of limitations issue, allowing plaintiffs to amend their complaints to add additional named plaintiffs and to plead a temporary taking would be futile. *See Mitsui Foods, Inc. v. United States,* 867 F.2d 1401, 1403–04 (Fed.Cir.1989); *Tyger Constr. Co. v. United States,* 28 Fed.Cl. 35, 54 (1993).

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion for summary judgment, considered as a motion to dismiss for lack of subject matter jurisdiction, is granted. Plaintiffs' motion to file plaintiffs' *Molaison* first amended complaint is denied; plaintiffs' motion to file plaintiff's *Marrero* first amended complaint is denied; plaintiffs' motion to file plaintiffs' *Drachenberg* first amended complaint is denied; and plaintiffs' motion to file plaintiffs' *Creppel* second amended complaint is denied. The Clerk of the Court shall enter judgment dismissing plaintiffs' complaints without prejudice.

**IT IS SO ORDERED.**