issue. *In re Air Crash Disaster Near Chicago, Illinois, on May 25, 1979*, 803 F.2d 304, 308 (7th Cir.1986) ("a federal court sitting in diversity must apply the collateral source rule of the state whose law governs the case"); *McInnis v. A.M.F., Inc.*, 765 F.2d 240, 245 (1st Cir.1985) ("it is well recognized that Congress did not intend the [Federal Rules of Evidence] to preempt so-called 'substantive' state rules of evidence such as the parole evidence rule, the collateral source rule, or the Statute of Frauds."); *see Lomax v. Nationwide Mutual Insurance Co.*, 964 F.2d 1343, 1345 (3d Cir.1992) (applying Delaware's collateral source rule); *Perry v. Allegheny Airlines, Inc.*, 489 F.2d 1349, 1352 (2d Cir.1974) (applying Connecticut's collateral source rule); *Rayfield v. Lawrence*, 253 F.2d 209, 212–13 (4th Cir.1958) (applying Virginia's collateral source rule); 19 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4512 (1982).

Because the district court refused to apply Alabama's collateral source rule to this diversity case, we REVERSE the judgment and REMAND the case for a new trial.

Jacques J. **CREPPEL**, Harold L. Molaison, Lloyd James Drachenberg and Marrero Land & Improvement Association, Limited, Plaintiffs–Appellants,

v.

The **UNITED STATES**, Defendant–Appellee.

No. 94–5070.

United States Court of Appeals, Federal Circuit.

Nov. 18, 1994.

David C. Loeb, Molaison, Price & Loeb, LLP, Metairie, LA, argued, for plaintiffs-appellants. With him on the brief was Harold E. Molaison.

Jacques B. Gelin, Atty., Dept. of Justice, Washington, DC, argued, for defendant-appellee. With him on the brief were Lois J. Schiffer, Acting Asst. Atty. Gen., Environment & Nat. Res. Div., John A. Bryson and Marc A. Smith, Attys. Also on the brief were Elizabeth A. Griffin, New Orleans District, U.S. Army Corps of Engineers, New Orleans, LA and Patrick Rankin, U.S. E.P.A. Region 6, Dallas, TX, of counsel.

Before RICH, NEWMAN and RADER, Circuit Judges.

RADER, Circuit Judge.

Landowners in Louisiana sued the United States Government for blocking a local land reclamation project. The United States Court of Federal Claims held that the statute of limitations bars their takings claims. *Creppel v. United States*, 30 Fed.Cl. 323 (1994). Because the statute of limitations bars the temporary but not the permanent taking claim, this court affirms in part and reverses in part.

## BACKGROUND

The claimants own swamp and marshland in Jefferson Parish, Louisiana. This land floods during the wet season. To control these floods, the Army Corps of Engineers (Corps) approved the Harvey Canal–Barataria Levee Project (Project) in 1964. The Corps designed the Project to close two navigable bayous and to build new levees and a pumping station. The Corps' budget was $1 million. In 1967 Jefferson Parish issued $3.6 million in bonds to guarantee the remaining costs of the Project.

The Project had two phases. Phase I, completed on November 24, 1973, dredged the bayous and used the mud to begin the new levee system. Phase I exhausted the Corps' $1 million budget. Before completion of Phase I, Congress passed the Clean Water Act of 1977 (CWA). Pub.L. No. 95–217, 91 Stat. 1567 (codified as amended in scattered sections of 33 U.S.C.). Section 404 of the CWA prohibits the discharge of dredge or fill material into navigable waterways without a permit. 33 U.S.C. § 1344 (1986 & Supp. V 1993) (section 404 of the CWA).

Under Phase II of the Project, the Corps planned to complete the levee system, close the bayous, and drain the land behind the levees. Phase II began in March 1974. The Parish let a contract for the pumping station to drain the land in August 1974. Mean-

while, on July 10, 1974, the Parish stopped construction until the Corps could determine whether the Project complied with section 404.

On March 26, 1975, the Corps decided that the Project should continue as originally planned. The Environmental Protection Agency (EPA) objected and suggested alternatives to draining the wetlands. The EPA also notified the Corps of its intention to use section 404(c) to prohibit construction of the levees with dredged or fill material.

After negotiations with the EPA and Parish representatives, Brigadier General Drake Wilson issued an order modifying the Project on November 16, 1976 (the Wilson Order). General Wilson ordered construction of the pumping station to halt and ordered the replacement of dikes with flood gates. This order would have eliminated the land reclamation benefits of the original Project. The EPA concurred with the Wilson Order.

Local property owners, many of whom are claimants in this case, obtained a court order permanently enjoining the Parish from abandoning the original Project. *Creppel v. Parish of Jefferson,* No. 199–345 (24th Jud.Dist.Jefferson Parish, Jan. 12, 1979). They also had obtained a preliminary injunction barring the Parish from abandoning the land reclamation project on October 31, 1977. This injunction became permanent as well. *Creppel v. Parish of Jefferson,* 352 So.2d 297 (La.Ct.App. 4th Cir.1977), *aff'd,* 384 So.2d 853 (La.Ct.App. 4th Cir.), *writ denied,* 392 So.2d 689 (La.1980).

In 1977, while the state action was pending, the same landowners sued in federal district court to overturn the Wilson Order. The district court held, on summary judgment, that General Wilson did not abuse his discretion in adopting the modified Project. *Creppel v. United States Army Corps of Eng'rs,* 500 F.Supp. 1108, 1119 (E.D.La. 1980), *rev'd in part and aff'd in part,* 670 F.2d 564 (5th Cir.1982). The United States Court of Appeals for the Fifth Circuit also found no abuse of discretion. The Fifth Circuit, however, reversed and remanded to determine whether local assurances were available for completion of the Project, and whether section 404(c) prevented it. *Crep-*

*pel,* 670 F.2d at 575. On remand, the district court found that the Parish's refusal to assure the revised Project made its completion impossible. *Creppel v. United States Army Corps of Eng'rs,* No. 77–25, slip op. at 5 (E.D.La. Aug. 13, 1984). The district court therefore ordered the original Project to proceed. *Id.*

The EPA began proceedings on December 17, 1984, to determine whether to block the Project by denying a permit under section 404(c). On August 30, 1985, the EPA regional administrator issued a Recommended Determination that the EPA use a section 404(c) veto. The EPA issued a Final Determination on October 16, 1985, permanently blocking the Project.

In May 1986, the landowners sought to overturn the EPA's decision. The district court upheld the EPA's Final Determination and remanded the case to the Corps to determine whether the Parish would grant assurances for the modified Project. *Creppel v. United States Army Corps of Eng'rs,* No. 77–25, 1988 WL 70103 (E.D.La. June 29, 1988). The Parish did not grant the assurances. The district court, therefore, dismissed the landowners' lawsuit. *Creppel v. United States Army Corps of Eng'rs,* No. 77–25 (E.D.La. October 12, 1989).

The claimants then filed four consolidated takings claims in the Court of Federal Claims on July 5, October 10, and October 11, 1991. The Government moved for summary judgment on the basis of a time bar under the statute of limitations. The claimants sought to amend their complaints to allege that the limitations period began only when the district court upheld the EPA's Final Determination on June 30, 1988. The Court of Federal Claims held that the claimants' cause of action accrued when the Wilson Order issued on November 16, 1976. The court granted summary judgment to the Government. *Creppel v. United States,* 30 Fed.Cl. 323 (1994). This appeal followed.

## DISCUSSION

A trial court properly grants summary judgment only when no genuine issue of material fact exists and the law entitles the

movant to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). This court reviews a grant of summary judgment by the Court of Federal Claims *de novo. Turner v. United States,* 901 F.2d 1093, 1095 (Fed.Cir.1990).

■ A six-year statute of limitations governs claims before the United States Court of Federal Claims:

> [E]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the [claim] thereon is filed within six years after such claim first accrues.

28 U.S.C. § 2501 (1988 & Supp. V 1993). A claim accrues when all events have occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action. *Japanese War Notes Claimants Ass'n v. United States,* 373 F.2d 356, 358 (Ct.Cl.), *cert. denied,* 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). The question here is whether "all events" occurred to fix the alleged liability of the Government six years before the claimants' 1991 takings claims.

The claimants allege two distinct takings: (1) a temporary taking commencing when the Wilson Order issued in 1976 and ending in 1988 when the district court upheld the EPA's Final Determination; and (2) a permanent taking commencing when the EPA issued its Final Determination in 1985. The temporary taking claim is time-barred; the permanent taking claim is not.

## I.

■ When presented with a regulatory taking claim, this court analyzes three separate criteria: (1) the character of the governmental action; (2) the economic impact of the regulation on the claimant; and (3) the extent that the regulation interferes with distinct investment-backed expectations of the property owner. *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). These criteria define the events that comprise a regulatory taking claim. Thus, in this case, this court must examine these criteria to discern the events triggering the six-year statute of limitations.

■ The first criterion—the character of the governmental action—examines the challenged restraint under the lens of state nuisance law. If the regulation prevents what would or legally could have been a nuisance, then no taking occurred. The state merely acted to protect the public under its inherent police powers. *Lucas v. South Carolina Coastal Council,* — U.S. —, —, 112 S.Ct. 2886, 2900, 120 L.Ed.2d 798 (1992). Here the courts must inquire into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented. *Id.* If state nuisance law does not justify the restraint, the court must proceed to the remaining criteria.

■ The second criterion—the economic impact of the regulation on the claimant—is designed to insure that not every restraint on private property results in a takings claim. This concern evolved into the threshold requirement that a claimant show that the Government denied him "economically viable use" of his land. *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987).

■ This criterion requires this court to determine whether a partial denial of use constitutes a taking. In this context, this court has recognized a dichotomy between noncompensable "mere diminutions" and compensable "partial takings" in borderline cases. *Florida Rock Indus., Inc. v. United States,* 18 F.3d 1560, 1570 (Fed.Cir.1994). "Mere diminution" occurs when the property owner has received the benefits of a challenged regulation, such that an "average reciprocity of advantage" results from it. *Lucas,* — U.S. at —, 112 S.Ct. at 2894; *Florida Rock,* 18 F.3d at 1570. A "partial taking" occurs when a regulation singles out a few property owners to bear burdens, while benefits are spread widely across the community. *Florida Rock,* 18 F.3d at 1571. This dichotomy does not arise where a regulation removes all economically viable use of the

property. Removal of all use indicates a fully compensable "categorical taking" of the property. *Lucas,* —— U.S. at ——, 112 S.Ct. at 2893; *Florida Rock,* 18 F.3d at 1568.

■ The third criterion—the extent to which the regulation interferes with the property owner's expectations—limits recovery to owners who can demonstrate that they bought their property in reliance on the non-existence of the challenged regulation. One who buys with knowledge of a restraint assumes the risk of economic loss. *Concrete Pipe & Prods., Inc. v. Construction Laborers Pension Trust for S. Cal.,* —— U.S. ——, —— ——, 113 S.Ct. 2264, 2291–92, 124 L.Ed.2d 539 (1993); *Golden Pacific Bancorp v. United States,* 15 F.3d 1066 (Fed.Cir.1994). In such a case, the owner presumably paid a discounted price for the property. Compensating him for a "taking" would confer a windfall.

■ Finally, the Constitution recognizes a distinction between a temporary and a permanent taking. U.S. Const., amend. V; *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). Simply declaring a regulation that takes property invalid does not grant a constitutionally sufficient remedy. *First English,* 482 U.S. at 319, 107 S.Ct. at 2388; *Yuba Natural Resources, Inc. v. United States,* 821 F.2d 638, 641–42 (Fed.Cir.1987). Thus, property owners cannot sue for a temporary taking until the regulatory process that began it has ended. This is because they would not know the extent of their damages until the Government completes the "temporary" taking. Only then may property owners seek compensation. *First English,* 482 U.S. at 321–22, 107 S.Ct. at 2389–90.

## II.

■ This case features allegations of both temporary and permanent takings. First, the temporary taking claim. On November 16, 1976, General Wilson ordered a halt to the land reclamation project. This order did not bar a nuisance, did significantly affect the economic value of the perennially flooded lands, and did abridge the owners' expectations of gaining valuable dry lands.

As the Court of Federal Claims noted, "[i]t is evident that the act first effecting any taking of plaintiffs' properties was the modification of the original Project by the Wilson Order." *Creppel,* 30 Fed.Cl. at 329. The trial court correctly found that the alleged temporary taking began when the Wilson Order issued in 1976. The order did not bar a nuisance but eliminated the landowners' expectation of land reclamation, causing the property's value to plummet. These consequences fulfilled the three requirements of a taking enunciated in *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659, and *Lucas,* —— U.S. at —— ——, 112 S.Ct. at 2886–94. With the issuance of the Wilson Order, then, "all the events" had occurred to fix the supposed liability of the Government. *Japanese War Notes,* 373 F.2d at 358. The landowners needed nothing more to state a takings claim.

The temporary taking allegedly ended on August 13, 1984, when the federal district court ordered the original Project to proceed. By restoring some measure of value to the claimants' property, this action concluded the "temporary" taking. *See Hendler v. United States,* 952 F.2d 1364, 1376 (Fed.Cir.1991). The claimants' property value remained intact for at least four months, until the district court suspended its August Order on December 14, 1984. During that time, the claimants regained their expectation of development, and could presumably have sold the land if they so wished. Because the claimants' temporary taking claims accrued with the August 1984 Order, the statute of limitations bars their claims.

## III.

This court's recent opinion in *Loveladies Harbor, Inc. v. United States,* 27 F.3d 1545 (Fed.Cir.1994) (in banc), gives rise to a question of tolling the statute of limitations for the alleged temporary taking. In *Loveladies,* a claimant sought to challenge the validity of a Government action in district court and simultaneously to challenge its economic consequences as a taking in the Court of Federal Claims. This court found it foreseeable that the district court would not adjudi-

cate the challenge before expiration of the statute of limitations on the takings claim. *Id.* at 1555. The court determined that a claimant may commence a challenge in the district court and in the Court of Federal Claims without facing the ticking jeopardy of the six year bar. *Id.* at 1556. The court stated: "[I]t would not be sound policy to force plaintiffs to forego monetary claims in order to challenge the validity of Government action, or to preclude challenges to the validity of Government action in order to protect a constitutional claim for compensation." *Id.*

██ Thus, in *Loveladies,* this court clarified that a litigant may file a suit challenging the validity of governmental regulatory activity concurrently with a takings claim arising from the same set of facts. Furthermore, if a district court finds the regulatory activity valid, the Court of Federal Claims must hear the takings claim even if the regulatory challenge consumes more than six years. Accordingly, the Court of Federal Claims may stay a takings action pending completion of a related action in a district court. *Cf. Pennsylvania R.R. Co. v. United States,* 363 U.S. 202, 204–05, 80 S.Ct. 1131, 1132–33, 4 L.Ed.2d 1165 (1960); *Aulston v. United States,* 823 F.2d 510, 514 (Fed.Cir.1987). In this case, however, the claimants had not filed concurrent actions in the Court of Federal Claims and a district court.

██ The claimants, therefore, did not face the Hobson's choice either to challenge the validity of the Wilson Order or bring a takings claim. They could have brought both suits contemporaneously and had the takings challenge stayed pending resolution of the validity issue. Instead, the claimants elected to pursue a single remedy. This conscious choice militates against "equitably tolling" the statute of limitations on the basis of the *Loveladies* decision. Otherwise, claimants would be able to file in the Court of Federal Claims as an afterthought, once their challenge in the district court was resolved. Requiring that suits be filed contemporaneously, as in *Loveladies,* better insures the claimants' good faith and rewards the diligent prosecution of grievances. It also encourages claimants to muster their evidence early, and to preserve it. In addition, it pre-

vents claimants from surprising the Government with potentially stale claims based on events that transpired many years before. Not coincidentally, these are the very reasons that statutes of limitation themselves exist. *See Chase Sec. Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945); *Order of R.R. Telegraphers v. Railway Express Agency,* 321 U.S. 342, 348–49, 64 S.Ct. 582, 586, 88' L.Ed. 788 (1944).

In addition, a federal district judge told the claimants as early as 1980 that the Court of Federal Claims was the proper forum in which to seek compensation. *Creppel,* 500 F.Supp. at 1120. This court will not invent a new reason to toll the statute of limitations and pretend that the claimants filed their takings claim contemporaneously with their 1976 challenge to the Wilson Order. The claimants' temporary taking claim is therefore time-barred.

## IV.

██ The claimants' permanent taking claim presents different questions. As this court recently held, a claim under the Fifth Amendment accrues when the taking action occurs. *Alliance of Descendants of Texas v. United States,* 37 F.3d 1478, 1481 (Fed.Cir. 1994), *citing Steel Improvement & Forge Co. v. United States,* 174 Ct.Cl. 24, 355 F.2d 627, 631 (1966). The Court of Federal Claims determined that the Government could have taken nothing permanently because the property's value remained unchanged after the temporary taking precipitated by the Wilson Order: "The EPA Final Determination did not diminish the value of the land any more than it had been diminished by the Wilson Order." *Creppel,* 30 Fed.Cl. at 331.

██ The sequence of events discloses an error in the trial court's conclusion. On August 13, 1984, the federal district court ordered that the original Project proceed. *Creppel,* No. 77–25 (E.D.La. Aug. 13, 1984). This order rendered the Wilson Order nugatory. The EPA then commenced proceedings on December 17, 1984 to determine whether it would issue a veto under section 404(c). The district court stayed its order,

pending the EPA's decision. On August 30, 1985, the EPA regional administrator issued a Recommended Determination that the EPA use a section 404(c) veto. The EPA issued a Final Determination on October 16, 1985, preventing completion of the Project.

The court order that the original Project proceed, which issued on August 13, 1984, restored some potential expectation of completion of the Project and thus some measure of the property's value. This value was maintained at least until December 1984, when the district court stayed its order. Between the invalidation of the Wilson Order in August 1984, and the stay in December 1984, the landowners owned 3,200 acres of land that appeared destined for development. By virtue of the district court's temporary restoration of the original Project, the landowners regained the "reasonable expectation" that their property value would increase. The EPA began hearings on whether to issue a section 404(c) order upon expiration of the district court's stay in December 1984. The EPA issued its order in October 1985.

Again, this court must determine when the events fixing any potential Government liability occurred. *Japanese War Notes*, 373 F.2d at 358. Until the EPA issued its Final Determination, the property owners retained some expectation of completion of the Project. The EPA's Final Determination "fixed the liability" of the Government. The claimants' permanent taking claim therefore accrued on October 16, 1985. On this date, the EPA finally fully vetoed the original Project and allegedly denied the claimants the ability to make economically viable use of their property. The EPA hearings on whether to issue a section 404(c) order did not fix the alleged liability of the Government because the outcome was unknown until the Final Determination issued. It remained unclear in December 1984 whether a section 404(c) order would issue, and whether that order, if it did issue, would totally veto the Project. The alleged taking therefore accrued when the EPA issued its actual section 404(c) order, not when it started to consider whether to prepare such an order.

The claimants filed their permanent taking claim in the Court of Federal Claims within six years after it accrued on October 16, 1985. The claim thus was not time-barred by the statute of limitations.

## CONCLUSION

The claimants' temporary taking claim is barred by the statute of limitations. Their permanent taking claim is not barred. The Court of Federal Claims shall evaluate the permanent taking claim on remand.

## COSTS

Each party shall bear its own costs.

*AFFIRMED–IN–PART, REVERSED–IN–PART, and REMANDED.*