**REED ISLAND–MLC, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 04–1130L.**

United States Court of Federal Claims.

July 22, 2005.

---

Daniel H. Squire, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, D.C., for plaintiff, with whom was Jonathan H. Siegelbaum, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, D.C.

Kelle S. Acock, General Litigation Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With her on the initial briefs was Thomas L. Sansonetti, Assistant Attorney General, Environment & Natural Resources Division, and on the supplemental briefs, Kelly A. Johnson, Acting Assistant Attorney General, Environment & Natural Resources Division. With Ms. Acock at the hearing were William Shapiro, Department of Justice, Washington, D.C., and Craig Jensen, Associate Counsel, Office of Counsel for the Commandant, Headquarters, United States Marine Corps, Washington, D.C.

### OPINION AND ORDER

LETTOW, Judge.

Reed Island–MLC, Inc. ("Reed MLC") owns a portion of Reed Island located in the St. Johns River at Jacksonville, Florida. In its complaint, filed on July 8, 2004, Reed MLC alleges that munitions-handling operations conducted by the United States Marine Corps ("Marine Corps") at nearby Blount Island imposed a restriction on the use of Reed MLC's property and caused Reed MLC to cease developmental activities on its property from 1998 into 2001. Compl. ¶¶ 2, 9–19. Reed MLC avers that the actions by the Marine Corps constituted a temporary taking of its property without just compensation in contravention of the Fifth Amendment to the Constitution. Compl. ¶¶ 25–27. The government answered the complaint on October 22, 2004, and, among other things, put forward a defense based upon the applicable statute of limitations, 25 U.S.C. § 2501.[1] Subsequently, the government

---

1. Section 2501 of Title 28 imposes a six-year statute of limitations on claims filed in this court,

moved for judgment on the pleadings based upon this defense. The thrust of the government's motion is that Reed Island knew of, and was subject to, the pertinent restriction on the use of its property more than six years prior to filing its claim. The question presented by this case is when a claim for temporary taking accrues for purposes of the statute of limitations applicable in this court.

After briefing, a hearing was held on the government's motion for judgment on May 23, 2005. Thereafter, at the court's request, the parties filed supplemental briefs respecting the applicability *vel non* of *Creppel v. United States*, 41 F.3d 627 (Fed.Cir.1994) (holding, among other things, that the statute of limitations begins to run on a temporary takings claim when the temporary takings period ends), a precedent not addressed by the initial briefing.[2] With all briefing having now been completed, the issue concerning the applicability of the statute of limitations raised by the government's motion for judgment on the pleadings is ripe for decision. For the reasons stated below, the government's motion is denied.

## BACKGROUND [3]

"[I]n May 1996 [or 1986], the United States leased 262 acres of land on Blount Island, Jacksonville, Florida in support of the Marine Corps['s] Maritime Prepositioned Force ('MPF') operations." Answer ¶ 8.[4] These operations "include the off-loading and back-loading of vehicles, equipment[,] and munitions from MPF ships at Blount Island." *Id.* "Department of Defense regulations provide for a geographic margin of safety during ordnance handling operations that is geographically represented as an Explosives Safety Quantity Distance (ESQD) arc." *Id.* ¶ 10. The government alleged that "the ESQD arc is effective only during ordnance handling operations." *Id.* The government admitted "that at times an ESQD arc extended over a portion of Reed Island." *Id.* ¶ 12.[5]

According to Reed MLC's president, Mitchell R. Montgomery, Reed MLC contracted on March 11, 1997 to purchase property on the eastern end of Reed Island without knowledge that an ESQD arc existed or ever had existed on the property. Plaintiff's Opposition to Defendant's Motion ("Pl.'s Opp'n"), Attachment (Affidavit of Mitchell R. Montgomery (Feb. 24, 2005) ("Montgomery Aff.")) ¶¶ 4–5. Separate title searches by two companies failed to show, or indicate the presence of, an ESQD arc extending onto the property. *Id.* ¶ 4. The transaction closed on March 4, 1998. *Id.* ¶ 5.

subject to tolling and special provisions not pertinent here. In relevant part, the statute provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (first paragraph).

2. Following the supplemental briefing, on June 17, 2005, the government also moved for leave to file a notice of supplemental authority respecting *Kemp v. United States*, 65 Fed.Cl. 818 (2005).

3. The recitations that follow do not constitute findings of fact by the court. Rather, the recited factual elements are taken from the parties' filings and are either undisputed or alleged and assumed to be true for purposes of the pending motion.

4. The government's answer appears to contain a typographical error regarding the date the government leased Blount Island. In a declaration filed with its motion for judgment, an official concerned with property management for the Marine Corps stated that "[s]ince May 1986, the Marine Corps has operated Blount Island Command on 262 acres of land in Jacksonville, Florida." Defendant's Motion for Judgment on the Pleadings and Memorandum in Support Thereof ("Def.'s Mot."), Ex. A (Declaration of Richard T. Hamner, Facilities Planner, Land Use and Military Construction Branch, Facilities and Services Division, Installations and Logistics Department at Headquarters, United States Marine Corps (Jan. 26, 2005) ("Hamner Decl.")) ¶ 2. For purposes of this motion, the court will assume that the Marine Corps began operations on Blount Island in 1986, not 1996.

In its motion, the government argues that "[p]laintiff's claim accrued as early as April 1992," implying that the ESQD arc came into being, or was in existence, at that time. Def.'s Mot. at 9.

5. An ESQD arc assumes the simultaneous detonation of all munitions involved in handling operations. *See* Hamner Decl. ¶ 4. Mr. Hamner of the Marine Corps explained that "[t]he radius of the [ESQD] arc is determined by the net explosive weight of the ammunition being handled, and a [Department of Defense Explosives Safety Board-]imposed minimum arc for fragmentation." *Id.*

Reed MLC began preparation for development, surveying and laying out roads and lots, installing water and sewer lines, and providing storm drainage facilities. Montgomery Aff. ¶ 6. In early May 1998, Reed MLC's surveyor, Charles Bassett, became aware that Marine Corps surveyors were visiting Reed Island to conduct surveys for an explosives arc, and he informed Mr. Montgomery of this visitation. *Id.* ¶ 7. Mr. Montgomery became concerned and initiated contacts with federal officials that led to meetings with representatives of the Marine Corps.

Representatives of the parties at those meetings have provided corresponding, largely congruent recollections of the substance of those meetings. At the first meeting, held at Blount Island on May 21, 1998, Mr. Montgomery was shown a map containing an ESQD arc extending over portions of his property. Montgomery Aff. ¶ 9. Richard Hamner, a facilities planner with the Marine Corps, attended that meeting. In a declaration, Mr. Hamner states that he advised Mr. Montgomery of the existence of the ESQD arc and the munitions-handling operations at Blount Island. Hamner Decl. ¶ 5. Correlatively, Mr. Montgomery told the Corps's representatives of his development plans. Montgomery Aff. ¶ 9. Mr. Montgomery states that the Marine Corps's representatives indicated that "the contours of the arc were still being worked out." *Id.* Mr. Hamner says he "advised Mr. Montgomery that the exact location of the arc on Reed Island was uncertain" and that the Marine Corps was "resurveying the arc to determine its exact location on the property." Hamner Decl. ¶ 5.[6] He also advised Mr. Montgomery

that the ordnance-handling operations typically occurred within a 14–hour period, ten-to-twelve times per year beginning on a Friday evening and ending on a Saturday morning. *Id.*[7]

In short, both Mr. Montgomery and Mr. Hamner agree that on May 21, 1998, it was uncertain which of Reed MLC's specific lots on Reed Island were affected by the ESQD arc. It is also apparent that the Marine Corps previously thought Reed Island was undeveloped, but that it now promised to take the information about Reed MLC's development into account and to "resolve[ ]" the situation. Montgomery Aff. ¶ 9. Mr. Montgomery avers that he understood that by promising that the situation would be "resolved," the Marine Corps meant it would consider options that would not encumber Reed MLC's property. *Id.* ¶ 9. Also, the Marine Corps appears never to have intended the ESQD arc to be permanent. Mr. Hamner states that he indicated to Mr. Montgomery on May 21, 1998 "that on July 16, 2000, the size of the ESQD arc would be permanently reduced, and [would] no longer extend over any portion of Reed Island." Hamner Decl. ¶ 5.[8]

Mr. Montgomery and Mr. Hamner met again on June 3, 1998 in Mr. Montgomery's office. Montgomery Aff. ¶ 11; Hamner Decl. ¶ 6. At that meeting, Mr. Hamner presented Mr. Montgomery with a map with an overlay delineating the ESQD arc with relation to Reed MLC's lots. Montgomery Aff. ¶ 11; Hamner Decl. ¶ 6; *see also* Defendant's Reply in Support of Defendant's Motion ("Def.'s Reply"), Ex. A (copy of the map). The map and overlay showed that an ESQD arc en-

---

**6.** Mr. Hamner's declaration indicates that "[b]efore March of 1998, Reed Island was undeveloped." Hamner Decl. ¶ 5. However, "[i]n April of 1998, construction work, trucks, dust clouds, and brush fires on Reed Island were observed by Marine Corps personnel at Blount Island Command." *Id.*

**7.** The government avers that it "does not have the authority to require unauthorized personnel to vacate property located within the ESQD arc during ordnance handling operations." Def.'s Mot. at 2. However, it notifies persons within the arc of planned operations and requests that those persons "voluntarily vacate" property located within the arc. *Id.* "[O]rdnance handling opera-

tions continue even if unauthorized personnel do not voluntarily vacate property within the ESQD arc." *Id.*

**8.** That date was evidently known by the Marine Corps in advance because of a projected change in the Marine Corps's MPF assets. Mr. Hamner states that "[o]n July 16, 2000, the size of the ESQD arc was permanently reduced at Blount Island Command because the Marine Corps brought on line an additional three (3) MPF ships, and spread-loaded the ammunition on board the existing and new ships." Hamner Decl. ¶ 4.

compassed 18 of Reed MLC's proposed residential lots on Reed Island. Hamner Decl. ¶ 6. Mr. Montgomery expressed his "surprise[ ] that the Ordinance [sic] ARC was not recorded in the public records of Duval County" and his concern about the economic impact the arc would have on Reed MLC's developmental plans. Montgomery Aff., Ex. B (Letter from Montgomery to Hamner (June 5, 1998)). Mr. Hamner discussed options being considered by the Marine Corps and indicated that the Corps had not yet made a decision on those optional courses of action. Hamner Decl. ¶ 7; *see also* Montgomery Aff. ¶ 11.

Promptly after the meeting on June 3, Mr. Montgomery sent a letter to Mr. Hamner reiterating his concern about the lack of prior notice and the adverse effect of the arc on Reed MLC's plans, and restating his urgent need for a decision from the Marine Corps. Montgomery Aff., Ex. B (Letter from Montgomery to Hamner (June 5, 1998)). Mr. Hamner responded by electronic mail on June 8, 1998, saying that Mr. Montgomery's letter was being passed up the chain of command and that the Marine Corps will "be in touch with you next week." Montgomery Aff., Ex. C (Electronic mail from Hamner to Montgomery (June 8, 1998)).

Mr. Montgomery sent Mr. Hamner another letter dated June 12, 1998 in which he restated the urgency of his situation because Florida law would require him to indicate any defects affecting property before closing on Reed MLC's "pre-sold lot contracts," which closing would begin in forty-five days. Montgomery Aff., Ex. D (Letter from Montgomery to Hamner (June 12, 1998)). Mr. Montgomery expressed the fear that the presence of an ESQD arc would cause the "pre-sold lot contracts [to] be terminated due to the questionable marketability of the property." *Id.*

D.E. Long of the Marine Corps's Blount Island Command sent Mr. Montgomery a letter dated June 22, 1998, stating that the Marine Corps was "continuing to evaluate operational and logistical alternatives to our ship loadings." Montgomery Aff., Ex. E at 1 (Letter from Long to Montgomery (June 22, 1998)). In addition, Mr. Long advised that ammunition loading operations would be conducted on June 26 and 27, 1998, and that an ESQD arc would be in effect on those dates. *Id.* The letter requested Mr. Montgomery's "voluntary cooperation in ensuring that the portion of your property within the ESQD arc is vacated during the June 26–27 operations." *Id.* at 2. Notwithstanding the projected ammunition loading operations on June 26 and 27, Mr. Long assured Mr. Montgomery "that the Marine Corps is diligently continuing to work the broader issues of the ESQD arc and your ongoing development activities." *Id.* Mr. Montgomery responded via a telephone call on June 25, 1998 that Reed Island would be vacated during June 26 and 27. Hamner Decl. ¶ 9.

A working group within the Marine Corps met on July 13, 1998 to address options for removing the ESQD arc from Reed Island prior to July 2000. Montgomery Aff., Ex. H (Mem. from Lieutenant Colonel Mel Rogers to Deputy, LOG Division (July 13, 1998)). An attachment to the memorandum listed the options then under consideration. *Id.*, attachment, at 3–9. Subsequently, an electronic-mail message circulated within the Marine Corps described the results of that meeting. *See* Montgomery Aff., Ex. I (Electronic-mail from Lieutenant Colonel Charles C. Cvrk, USMC to Hamner, *et al.* (July 14, 1998)). The latter communication ranked the options under consideration based on "Cost," "Safety/Risk," "Political," and "Legal" considerations, in the following order:

1. Do not change current ops

2. Instream offload

3. Temporary Lease of the South Shore

4. Mixed instream and offload at another site

5. Offload at another site

*Id.*, Ex. H; *see also id.*, Ex. I (excluding fourth option). These communications addressed the "pros" and "cons" of each option, and the electronic-mail message urged each recipient to "provide your respective leadership with your agency's recommended [alternative] and advise me of which way your principal is leaning on any of these options." Montgomery Aff., Exs. H & I; *see also id.*, Ex. H ("Please review and provide com-

ments/recommendations to me or LtCol. Cvrk by 11:00 14 Jul 98."). Two days later, D.E. Long of Blount Island Command sent a memorandum to the Captain of the Port at the United States Coast Guard in Jacksonville, reciting the same "several options ... to keep the explosive arc off [Reed Island] prior to [July 2000]." Montgomery Aff., Ex. J (Mem. from Commanding Officer, Blount Island Command to Captain of the Port, United States Coast Guard (July 16, 1998)). The memorandum requested "comments or recommendations on any or all of the options by 27 July 1998." *Id.*

Subsequently, in a letter sent on July 31, 1998, the Marine Corps informed Mr. Montgomery that it had rejected the optional courses of action and would not change current operations. Montgomery Aff., Ex. K (Letter from G.B. Higginbotham, Major General, United States Marine Corps to Montgomery (July 31, 1998)). The letter informed Mr. Montgomery that "[a]s discussed ..., the Marine Corps has been evaluating operational and logistical alternatives to our maintenance cycle operations at Blount Island. However, ... we are planning to continue our operations at Blount Island as they are currently executed." *Id.* at 1. The letter further advised Mr. Montgomery that eleven separate ammunition handling operations were scheduled to occur over the following twenty-three months and requested Mr. Montgomery's continued voluntary cooperation in vacating the affected property during those operations. *Id.* at 2. After receiving this notice, Mr. Montgomery notified his lot purchasers of the ESQD arc. Montgomery Aff. ¶ 21. All the lot purchasers subsequently terminated their purchase agreements and obtained a refund of payments previously made. *Id.; see also* Montgomery Aff., Ex. L (Notices from lot purchasers to Mr. Montgomery).

Two and one-half years later, in a letter dated January 31, 2001, the Marine Corps provided written notice that as of July 16, 2000, the ESQD arc had been reduced to a

point where it no longer extended over any portion of Reed Island. Answer ¶ 19. The Marine Corps refused to state that the ESQD arc would not again extend over Reed Island in the future. *Id.*

### STANDARD FOR DECISION

■ Reed MLC asks the court to convert the government's motion for judgment on the pleadings under Rule 12(c) of the Rules of the Court of Federal Claims ("RCFC") to a motion for summary judgment under RCFC 56(c) because the motion relies on matters outside the pleadings. Pl.'s Opp'n at 9. Rule 12(c) provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56." RCFC 12(c). That part of Rule 12(c) applies to a motion made under Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted. However, it does not apply to a motion made under Rule 12(b)(1) to dismiss for lack of jurisdiction over the subject matter, which may not be converted into a motion for summary judgment even though the court in considering it may address matters outside the pleadings. *Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1383 (Fed.Cir. 2002).[9] Challenges to "a court's general power to adjudicate in specific areas of substantive law" are properly raised as motions under Rule 12(b)(1), whereas "questions of whether in a specific case a court is able to exercise its general power with regard to the facts peculiar to the specific claim" are properly brought as motions under Rule 12(b)(6). *Anderson v. United States*, 59 Fed.Cl. 451, 455–56 (2004) (quoting *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed.Cir.1999)). In this court, the applicable six-year statute of limitations codified as 28 U.S.C. § 2501 is jurisdictional and so is properly asserted in a motion made under Rule 12(b)(1). *See Anderson*, 59 Fed.Cl. at 457 n. 10. Even though a motion under Rule 12(b)(1) may not be converted into a motion for summary judgment,[10] where a "movant is deemed to be

---

9. *Toxgon* addresses Fed.R.Civ.P. 12, which corresponds verbatim to the pertinent portions of RCFC 12.

10. An exception arises in cases where, unlike in the present case, the jurisdictional issues are inextricably intertwined with the merits. *See*

challenging the factual basis for the court's subject matter jurisdiction," the court "is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings." *Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1583–84 (Fed.Cir.1993). Consequently, in considering the government's motion made under RCFC 12(c), the court will consider all materials submitted by the parties and apply the same standard for decision as it would under RCFC 12(b)(1). *See Lombardo v. State Farm. Mut. Auto. Ins. Co.,* 800 F.Supp. 208, 211 (E.D.Pa.1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367, at 515 (1990)).

Jurisdiction must be established as a threshold matter before the court may proceed with the merits of an action. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). As a general matter, "[a]ll federal courts are courts of limited jurisdiction." *RHI Holdings, Inc. v. United States,* 142 F.3d 1459, 1461 (Fed.Cir.1998). This court has particular limitations on its jurisdiction derived from its posture as a forum for claims against the United States. Here, subject matter jurisdiction is, among other things, "prescribed by the metes and bounds of the United States' consent to be sued in its waiver of immunity." *Id.* That waiver " 'cannot be implied but must be unequivocally expressed.' " *Saraco v. United States,* 61 F.3d 863, 864 (Fed.Cir.1995) (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)). "The 6–year statute of limitations on actions against the United States is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1576–77 (Fed.Cir. 1988). Where this court's subject matter jurisdiction is challenged, the plaintiff bears the burden of proof by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed. Cir.1988). Nonetheless, the "[d]enial of a taking claim on the basis of the defense of limitations is warranted only when the facts alleged demonstrate conclusively that such a decision is required as a matter of law." *John R. Sand & Gravel Co. v. United States,* 57 Fed.Cl. 182, 193 (2003) (quoting *Juda v. United States,* 6 Cl.Ct. 441, 450 (1984)) (internal quotation marks omitted).

## ANALYSIS

The Tucker Act, 28 U.S.C. § 1491(a)(1), grants the United States Court of Federal Claims jurisdiction to render judgment on any claim against the United States founded, among other things, on the Constitution, acts of Congress, or regulations of executive departments. *See United States v. Testan,* 424 U.S. 392, 397–98, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Because the Takings Clause of the Fifth Amendment requires a remedy for a governmental taking of property for public use without just compensation, Reed MLC's claim is properly before this court. *See Narramore v. United States,* 960 F.2d 1048, 1051 (Fed.Cir.1992).

Apart from governmental acquisition of title to property through condemnation proceedings, a taking occurs when the government deprives an owner of the use and enjoyment of his or her property. *United States v. Causby,* 328 U.S. 256, 261–62, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); *United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945). Landowners must be justly compensated for both permanent and temporary takings. *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California,* 482 U.S. 304, 318, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (" '[T]emporary' takings ... are not different in kind from permanent takings, for which the Constitution clearly requires compensation."). As a general matter, a temporary taking differs from a permanent taking primarily because a temporary taking is limited in duration or is acknowledged to be readily reversible. *See, e.g., Yuba Natural Res., Inc. v. United States,* 821 U.S. 638, 641–42 (Fed.Cir.1987).

■ The two forms of taking are also different for claim accrual purposes. A per-

*Thoen v. United States,* 765 F.2d 1110, 1114    (Fed.Cir.1985).

manent takings claim accrues when all events which fix the government's liability have occurred, and the plaintiff is aware of their existence. *See Hopland,* 855 F.2d at 1577. By contrast, a temporary takings claim accrues when "the regulatory [or other] process that began it has ended" because, among other things, the property owner "would not know the extent of their damages until the Government completes the 'temporary' taking." *Creppel,* 41 F.3d at 632. Only when " 'all events' occurred to fix the alleged liability of the Government" would the temporary takings claim accrue. *Id.* at 631; *see also Independence Park Apartments v. United States,* 61 Fed.Cl. 692, 709 (2004) (citing *Creppel* in holding that "[t]he end of the temporary taking establishes the date when the statute of limitations begins to run on the takings claim").

■ From the initial meeting between Mr. Montgomery and Mr. Hamner on May 21, 1998 and consistently thereafter, the Marine Corps indicated that the ESQD arc would be temporary, ending in July 2000. *See supra,* at 4; Hr'g Tr. at 16. And, on January 31, 2001, the Marine Corps confirmed that the ESQD arc had been reduced such that it no longer extended over any part of Reed Island. *See supra,* at 6–7. Only a temporary restriction is at issue notwithstanding the fact that the Marine Corps in January 2001 refused to confirm that an ESQD arc would not be extended over Reed Island in the future. *See supra,* at 7. Any new imposition of an ESQD arc would engender a different takings claim. Consequently, the taking alleged in this case is the temporary variety, not a permanent one.

The government argues that Reed MLC's claim accrued in April 1992 when the ESQD arc first encompassed the property in question. Def.'s Mot. at 7. In the alternative, it argues that Reed MLC's claim accrued at the latest by the June 3, 1998 meeting where Mr. Montgomery received notice of the exact location and expected duration of the arc. *Id.* Reed MLC responds that its claim did not accrue at either of these times because it did not have notice in 1992, and it did not then own the property affected. Also, during dis-

cussions with representatives of the Marine Corps in May and June 1998, the Marine Corps represented that it was considering options that would eliminate the ESQD arc from Reed MLC's property. Pl.'s Opp'n at 10–15. Consequently, Reed MLC urges that its claim did not accrue until it received the notice by letter dated July 31, 1998, definitively stating that the Marine Corps had rejected optional courses of action. *Id.* at 15. In the alternative, Reed MLC argues that the statute of limitations should be suspended until July 31, 1998 because, until that point, any final decision on the alternative ordnance handling operations was withheld by the Marine Corps's representations throughout the various meetings that it was actively considering alternatives. *Id.* at 17.

The government's argument that Reed MLC's takings claim accrued in 1992 is manifestly flawed. Reed MLC did not even acquire the Reed Island property until March 4, 1998. Reed MLC, prior to its acquisition of the property, could not have been subject to any governmental imposition respecting the property. Indeed, before the acquisition, it would not have owned a property interest that would support a takings claim. Moreover, Reed MLC acquired the property without any notice of an ESQD arc, and it proceeded with its developmental activities in complete ignorance of such an arc. *See supra,* at 3.

*Creppel* poses an imposing obstacle to the government's remaining arguments. The government argues that *Creppel* should be distinguished because it is premised on the requirement that plaintiffs alleging a temporary taking must "know the extent of their damages" before a temporary takings claim accrues. Defendant's Supplemental Brief in Support of its Motion for Judgment on the Pleadings ("Def.'s Supp. Br.") at 4 (quoting *Creppel,* 41 F.3d at 632). This aspect of *Creppel* might be better understood to mean that the claim in that case accrued when " 'all the events' had occurred to fix the supposed liability of the Government." *Creppel,* 41 F.3d at 632 (quoting *Japanese War Notes Claimants Ass'n v. United States,* 178 Ct.Cl.

630, 373 F.2d 356, 358 (1967)).[11] Here, Reed MLC did not know the extent of the imposition on its property in June 1998. Certainly after the meeting held on June 3, 1998, Reed MLC knew what its damages *might be* if the Marine Corps were ultimately to reject the options it was considering. However, the Marine Corps's representations that it was actively considering options to eliminate the imposition prevented Reed MLC from knowing the likely extent of its loss with any certainty. Further, the strong evidence that the Marine Corps actually reconsidered its operations indicates that there was a distinct possibility that the Marine Corps would alter those operations and affect the extent of the alleged taking. Consequently, " 'all events' [would not have] occurred to fix the alleged liability of the Government six years before" Reed MLC filed its complaint. *Creppel,* 41 F.3d at 631.

On the undisputed facts, the Marine Corps did not reject the options available to avoid imposing an ESQD arc on Reed MLC's property until July 31, 1998 when it gave written notice by letter to that effect. *See supra,* at 6. That date is within the six-year limitations period, and thus Reed MLC's claim cannot be barred by the statute of limitations. However, *Creppel* compels the finding that Reed MLC's claim accrued at a still later date when it received confirmation in the letter dated January 31, 2001, indicating that the ESQD arc no longer extended over Reed

Island. Reed Island's claim accrued at this time even though on July 16, 2000, the Marine Corps ceased the operations at Blount Island that caused an ESQD arc to encumber Reed Island. The relevant date is that of the confirmatory notice rather than the date of the last actual encumbrance because "a cause of action against the government has 'first accrued' only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." *Hopland,* 855 F.2d at 1577 (emphasis in original).[12]

The government also argues that in light of *Bass Enterprises Production Co. v. United States,* 133 F.3d 893 (Fed.Cir.1998), this court should hold that any takings claim accrued with "the government's initial decision that affects a claimant's property." Def.'s Supp. Br. at 5. This argument is unavailing because *Bass Enterprises* does not address application of the statute of limitations. Rather, in *Bass* the Federal Circuit held that a temporary takings claim *may* be brought before cessation of the regulation, 133 F.3d at 896, not that it *must* be brought before then.

In effect, the state of the law regarding accrual of temporary takings claims is closely analogous to that applicable to suits for breach of contract upon an anticipatory repudiation. *See Franconia Assocs. v. United States,* 536 U.S. 129, 144, 122 S.Ct. 1993, 153

---

11. The question the Federal Circuit was deciding in *Creppel* was "whether 'all events' occurred to fix the alleged liability of the Government six years before the claimants' 1991 takings claims." 41 F.3d at 631.

12. On its facts, this case bears a few superficial similarities to *Kemp v. United States,* 65 Fed.Cl. 818 (2005), in which the court held that an alleged temporary, physical taking of property involved in an expansion of a national park was actually a permanent physical taking and that the taking accrued when the government began open and notorious use of plaintiff's land. The instant case also appears to be a physical taking because the ESQD arc, and the danger of damage and harm from explosion, effectively forestalled habitation on Reed MLC's property. The circumstances are akin to those in *Causby* where the Supreme Court held that frequent low-level flights of military airplanes over a chicken farm effected a taking of an easement on the owner's property. 328 U.S. at 260–67, 66 S.Ct. 1062.

In most other respects, this case and *Kemp* are readily distinguishable. In *Kemp* there was no question of what was taken because the government's intrusion on plaintiff's land was "open and continuous." 65 Fed.Cl. at 825–26. In this case, the government's imposition was not apparent and, indeed, could not have been discerned absent knowledge of the existence of munitions-loading operations at Blount Island and of the resulting ESQD calculations. Also, in *Kemp* the plaintiff had asserted that a nineteen-year period of temporary use was involved, which the court refused to deem a "temporary" taking and instead considered a permanent taking. 65 Fed.Cl. at 823–25. The alleged taking in *Kemp* "ended" only when the plaintiff sold her interest in the property at issue, and it is not evident from the report of the facts that the government ever stopped making "open and continuous" use of the property. *Id.* at 825–26.

L.Ed.2d 132 (2002) (noting that a non-breaching party faced with the repudiation of a contract may elect to treat the repudiation as breach and bring suit immediately, or wait until performance is due, at which point the statute of limitations begins to run). In *Franconia*, the Supreme Court recognized that "[t]he plaintiff should not be penalized for leaving to the defendant an opportunity to retract his wrongful repudiation ...." *Id.* at 146, 122 S.Ct. 1993 (quoting 4 Arthur L. Corbin, *Contracts* § 989, at 967 (1951)) (internal quotation marks omitted). So too here.

In short, *Creppel* governs this case and dictates that the statute of limitations began to run on Reed MLC's temporary takings claim only when the Marine Corps confirmed in January 2001 that it had ceased the munitions-handling operations at Blount Island that encumbered Reed Island with an ESQD arc.[13]

## CONCLUSION

For the reasons set forth above, the government's motion for judgment on the pleadings is DENIED. The government's motion for leave to file notice of supplemental authority, submitted June 17, 2005, is GRANTED. On or before August 22, 2005, the parties shall file a joint status report that addresses a proposed plan for discovery and other pre-trial preparatory steps. *See* RCFC Appendix A, ¶ 5.

IT IS SO ORDERED.

---

13. During the initial briefing, the parties argued their positions only with reference to precedents concerning permanent takings. *See* Def.'s Mot. at 7–10; Pl.'s Opp'n at 10–17. The government argued, for example, that Reed MLC's situation was analogous to appealing a denied permit application, which does not suspend statutes of limitations. *See* Def.'s Supp. Br. at 8–9; *see Seiber v. United States*, 364 F.3d 1356, 1365–66 (Fed.Cir.2004); *Bayou Des Familles Dev. Corp. v. United States*, 130 F.3d 1034, 1039 (Fed.Cir. 1997). However, under *Bayou* and similar cases, a takings claim springing from a permit denial does not ripen until a "final decision" is issued. *See Bayou*, 130 F.3d at 1038. In this case the Marine Corps did not reach anything approaching a final decision on whether it would alter its ordnance-handling plans until it sent its letter dated July 31, 1998, making Reed MLC's claim timely even were this line of analysis to be accepted. In this same vein, in *Forsgren v. United States*, 64 Fed.Cl. 456, 459 (2005),

the court concluded that, "[e]ven if the Court had found that the damage to [p]laintiffs' property was otherwise foreseeable prior to [the date before which the claim would be barred], [d]efendant's motion to dismiss would fail because the government's attempts to repair the damage to Plaintiffs' land caused the date of accrual to be uncertain." Because the "appearance of cooperation from the government could have caused [p]laintiffs to delay filing suit," the court held in *Forsgren* that penalizing plaintiffs for trying to cooperate with the government instead of immediately filing suit would be incompatible with the Supreme Court's mandate in *United States v. Dickinson* that takings claims "be enforced with an eye toward fairness." *Id.* at 460 (citing *United States v. Dickinson*, 331 U.S. 745, 749, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947)). *See also Banks v. United States*, 314 F.3d 1304, 1310 (Fed.Cir.2003) (mitigation efforts by the government rendered plaintiffs' claims indefinite and inchoate).