**OVERVIEW BOOKS, LLC and Lev Tsitrin, Plaintiffs,**

v.

**UNITED STATES, Defendant.**

No. 05–775C.

United States Court of Federal Claims.

July 24, 2006.

Norman J. Finkelshteyn, Brooklyn, NY, for plaintiffs.

Michael S. Dufault, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Todd M. Hughes, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This case concerns the Library of Congress' Cataloging in Publication ("CIP") program. Through the CIP program, the Library prepares a bibliographic record for a book that has not yet been published; this bibliographic record is distributed to libraries, bibliographic services, and book vendors in advance of publication. The CIP program also assigns a Library of Congress Control Number ("LCCN") to the book. For a publication to be included in the CIP program, a book and the book's publisher must conform with certain criteria established by the Library. Books that do not meet these requirements may apply for an LCCN through an alternate program, the Preassigned Control Number ("PCN") program, which does not distribute the book's information to libraries and vendors as the CIP program does. One of the requirements for inclusion in the CIP program is that the publisher must have previously published books from at least three different authors. Another is that the author not pay for or subsidize publication of the book.

Plaintiff Lev Tsitrin, under the pseudonym Vel Nirtist, is the author of *The Pitfall of Truth: Holy War, its Rationale and Folly ("Pitfall")*, a book published by plaintiff Overview Books, LLC ("Overview Books") in 2005. Overview Books was formed by Mr. Tsitrin; *Pitfall* was the first and has been the only book published by Overview Books. Plaintiffs aver that Overview Books applied to the Library of Congress for inclusion of *Pitfall* in the CIP program. They state that the Library excluded *Pitfall* from the CIP program because Overview Books had not previously published books from three different authors and the book was self-published. Plaintiffs allege that the Library's "three author" and "self-published" restrictions deprive plaintiffs of an opportunity to compete with other publishers and to reap financial rewards from the publication of *Pitfall* because failure to participate in the CIP program denies plaintiffs ready access to markets for the book, such as libraries

and booksellers. As a result, plaintiffs contend that the Library has effectively taken plaintiffs' property. Plaintiffs also contend that the "three author" criterion abridges their First Amendment right to freedom of speech.

Plaintiffs filed their complaint on July 22, 2005. Thereafter, the government filed a motion to dismiss, and plaintiffs filed a cross-motion for summary judgment. The motions have been fully briefed, and a hearing on the motions was held on June 30, 2006. The case is now ready for disposition. For the reasons set out below, defendant's motion to dismiss is granted, and plaintiffs' motion for summary judgment is denied.

## BACKGROUND[1]

### A. The CIP Program

The Library of Congress is an agency of the legislative branch of the United States government. *See* 2 U.S.C. §§ 131–185. The Library includes several internal components (or service units), including Library Services, of which the Cataloging in Publication Division is a part. *See* Library of Congress General Information, http://www.loc.gov/about/generalinfo.html (last visited July 19, 2006); Library of Congress Organization Chart (Sept. 30, 2004), *available at* http://www.loc.gov/about/LC—org—Sep04.pdf. The Cataloging in Publication Division administers the CIP Program. *See* Compl. ¶ 7. The CIP program began in 1971 as a special project, funded in part by grants from the Council on Library Resources Inc. and the National Endowment for the Humanities. *Cataloging in Publication Celebrates 30th Anniversary*, Library of Congress Information Bulletin (May 2001), http://www.loc.gov/loc/lcib/0105/cip.html. Since its founding, the CIP program has evolved from creating 6,500 pre-publication cataloging records annually to creating more than 57,000 cataloging records annually. *Id.*

The purpose of the CIP program is to serve the nation's libraries by cataloging books in advance of publication. Compl. ¶ 5; Plaintiffs' Cross–Motion for Summary Judgment and Opposition to Defendant's Motion to Dismiss ("Pls.' Mot.") Appendix ("Pls.' App.") tab D at 1 (Purpose of CIP). "Publishers participating in the CIP program submit electronically the full text of eligible publications to the Library." Pls.' App. tab D at 1. The Library creates a bibliographic record for each publication and transmits it to the publisher, which then prints the record on the verso of the title page. *Id.* The Library thereafter assigns an LCCN to be associated with the bibliographic record of each publication. *Id.* at 9 (CIP Frequently Asked Questions ("CIP FAQ")).[2] Through this process, "a bibliographic record is immediately available to each library that acquires a copy of the book, thereby saving libraries the time and expense of individually cataloging each book they acquire." *Id.* at 1 (Purpose of CIP). The Library "distributes these records weekly in machine readable form to large libraries, bibliographic services, and book vendors around the world. Many of these organizations redistribute these records in products and services designed to alert the library community to forthcoming publications and to facilitate book ordering." *Id.* There is no charge for participation in the CIP program. *Id.* at 7 (CIP FAQ).

Participation in the program is limited to publications "that are most likely to be widely acquired by the nation's libraries." Pls.' App. tab D at 4 (Scope of the CIP Program). The Library lists certain types of publications as ineligible, including: "[b]ooks published by firms that have published books by fewer than three different authors;" "[b]ooks paid for or subsidized by individual authors;" "[b]ooks that are already published;" and "[b]ooks published on demand." *Id.* The Library's website explains that such constraints on the program are necessary because "[r]esources available to support the CIP pro-

---

1. The recitations that follow do not constitute findings of fact by the court. Rather, the recited factual elements are taken from the parties' filings and are either undisputed or alleged and assumed to be true for purposes of the pending motions.

2. An International Standard Book Number ("ISBN") may be obtained contemporaneously from the U.S. ISBN Agency (not the Library of Congress). Pls.' App. tab D at 9–10 (CIP FAQ).

gram are limited." *Id.* at 8 (CIP FAQ). The Library further explains that the policies that govern the CIP program, including decisions regarding those materials that are included or excluded, "are developed in consultation with the library community." *Id.*

Publications that are not encompassed within the CIP program may be eligible for inclusion in an alternative program, the PCN program. Compl. ¶ 17; Pls.' App. tab D at 8 (CIP FAQ). The CIP and PCN programs are mutually exclusive. Pls.' App. tab D at 8–9. The PCN program does not automatically exclude books published by firms that have published books by fewer than three different authors, books paid for or subsidized by individual authors, and books published on demand. *See* Scope of the PCN Program, http://pcn.loc.gov/pcn005.html (last visited July 19, 2006). Publications submitted through the PCN program may be selected for creation of a bibliographic record and concomitant LCCN. PCN Frequently Asked Questions, http://pcn.loc.gov/pcnfaq.html (last visited July 19, 2006) ("PCN FAQ"). However, not all works submitted through the PCN program will be selected for creation of a bibliographic record. Each submitted book is reviewed by a Library selection officer. If a book is selected for retention in the Library's collections, then a bibliographic record will be created and this record will appear in the Library's online catalog; if the book is not selected for retention, the Library will not create a catalog record for the book. *Id.* Even though a book may be selected for the creation of a bibliographic record and LCCN through the PCN program, the book's information will not be distributed through the same channels as those that are used for books included in the CIP program. *Id.*; Compl. ¶¶ 18–20.

### B. Plaintiffs' Attempt to Participate in the CIP Program

Working through an agent, Mr. Tsitrin sought to have *Pitfall* published by established publishing houses during 2003 and 2004. Pls.' App. tab A at 3–4 (Affidavit of Tsitrin (Mar. 12, 2006)). After approximately 45 different publishing houses rejected the work, Mr. Tsitrin determined that he would publish it himself. *Id.* For this purpose, he registered Overview Books as a limited liability company under the laws of New York, with a principal place of business in Brooklyn, New York. *Id.* at 4. In September 2004, Overview Books applied for a CIP record for *Pitfall.* Compl. ¶ 15. The Library denied this application on the grounds that "[b]ooks paid for or subsidized by individual authors or books published by a house that publishes the works of only one or two authors are ineligible for this program." Pls.' App. tab C (E-mail from Tina Chubbs, Library, to Tsitrin); *see* Compl. ¶ 17. Mr. Tsitrin called the head of the CIP Division to inquire about the criteria for participation and to urge that *Pitfall* be included in the program, but he was informed that the rules prohibited acceptance of *Pitfall* into the CIP program. Pls.' App. tab A at 6. Even though the book was not accepted into the CIP program, Mr. Tsitrin published *Pitfall* in January 2005. *Id.*

Plaintiffs filed their complaint in this court on July 22, 2005. In moving to dismiss, the government claims that this court lacks jurisdiction over plaintiffs' claims pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), *see* Defendant's Motion to Dismiss ("Def.'s Mot.") at 3–8, and alternatively that plaintiffs fail to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6). *See id.* at 8–10. After plaintiffs filed a response and cross-motion for summary judgment and the motions were fully briefed, a hearing was held on June 30, 2006.

### DISCUSSION

#### A. Defendant's Motion to Dismiss Pursuant to RCFC 12(b)(1)

Jurisdiction must be established as a threshold matter before the court may proceed with the merits of this or any other action. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). As the plaintiffs, Mr. Tsitrin and Overview Books bear the burden of establishing the court's subject-matter jurisdiction over their claims. *See McNutt v. General Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Reynolds v. Army and Air Force*

*Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). "Challenges to 'a court's general power to adjudicate in specific areas of substantive law' " are properly raised by way of motions under RCFC 12(b)(1). *Reed Island–MLC, Inc. v. United States*, 67 Fed.Cl. 27, 32 (2005) (quoting *Anderson v. United States*, 59 Fed. Cl. 451, 455–56 (2004), and *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed.Cir.1999)). When ruling on a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), the court must accept as true the complaint's undisputed factual allegations and construe the facts in the light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Hamlet v. United States*, 873 F.2d 1414, 1415–16 (Fed.Cir.1989). If the undisputed facts reveal any possible basis on which the plaintiff might prevail, the court must deny the motion. *See Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683 (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Plaintiffs' complaint jurisdictionally rests upon the Tucker Act, 28 U.S.C. § 1491(a),[3] and requests monetary damages as well as an order from the court requiring the Library to alter its CIP program-eligibility criteria to eliminate the self-publishing and three-author requirements and to allow *Pitfall* to participate in the CIP program. *See* Pls.' Mot. at 39.

■■■ In support of their claims, plaintiffs make numerous references to their rights to free expression of ideas under the First Amendment of the Constitution. *See* U.S. Const. amend. I. However, with respect to jurisdiction under the Tucker Act, the Federal Circuit has determined that the First Amendment, standing alone, does not expressly command the payment of money and may not serve as a jurisdictional predicate

for claims in this court. *See United States v. Connolly*, 716 F.2d 882, 886–87 (Fed.Cir. 1983) (citing *Featheringill v. United States*, 217 Ct.Cl. 24, 32–33 (1978)). Therefore, to the extent that plaintiffs invoke the First Amendment as a basis for their claims, this court is without jurisdiction to consider them. Alleged violations of the First Amendment may only be considered collaterally by this court when making a determination whether payment is due under a money-mandating statute, *e.g.*, back pay. *Connolly*, 716 F.2d at 887–88 (distinguishing *Jackson v. United States*, 192 Ct.Cl. 765, 428 F.2d 844 (1970), and *Swaaley v. United States*, 180 Ct.Cl. 1, 376 F.2d 857 (1967), as cases "primarily involv[ing] claims for back pay," in which "the plaintiffs ... sought such compensation in accordance with federal pay statutes."). Consequently, the court must address whether there is any independent basis for bringing a monetary claim against the federal government.

■■■ Notwithstanding their frequent references to rights of free expression under the First Amendment, plaintiffs clothe their several claims in the language of a taking in contravention of the Fifth Amendment of the Constitution. *See* U.S. Const. amend. V. First, they aver that the Library, by disqualifying *Pitfall* from participating in the CIP program, has deprived plaintiffs of the value of the book, which is "realized by that book being read and bought." Pls.' Mot. at 16–17; *see id.* at 25–27. Second, plaintiffs contend that they have a form of vested "property right to the CIP license and subsidy." *Id.* at 33. The form used by plaintiffs in framing their claims reflects the core of this court's juridical power under the Tucker Act. A claim for compensation pursuant to the Takings Clause of the Fifth Amendment constitutes a money-mandating provision sufficient to invoke the jurisdiction of this court. *See,*

---

3. In pertinent part, 28 U.S.C. § 1491(a) provides:
   (1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort....

   (2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing ... correction of applicable records, and such orders may be issued to any appropriate official of the United States.

**42**

*e.g., Moden v. United States,* 404 F.3d 1335, 1341–42 (Fed.Cir.2005); *Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 901 (Fed.Cir.1986). Where a plaintiff's "well-pleaded complaint [is] clearly grounded on a statute [or Constitutional provision] that mandates compensation, ... the Court of Federal Claims [has] subject-matter jurisdiction to address the case on the merits." *Fisher v. United States,* 402 F.3d 1167, 1175 (Fed.Cir.2005). If, after the court determines that it has jurisdiction to hear a case based upon a well-pleaded complaint, the court concludes that the plaintiff's case does not fit within the scope of the money-mandating source, the result is that the "plaintiff loses on the merits for failing to state a claim on which relief can be granted." *Id.* at 1175–76.

In the case at hand, plaintiffs specifically seek compensation in the amount of $500,000 pursuant to the Fifth Amendment, plus injunctive and declaratory relief. Pls.' Mot. at 40; *see* Compl. at 4. Plaintiffs have put forward allegations which, though novel, are not patently frivolous and are "grounded on a [Constitutional provision] that mandates compensation." *Fisher,* 402 F.3d at 1175. It would therefore be inappropriate to dismiss plaintiffs' case for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1). Rather, the court must make an inquiry into the merits of plaintiffs' case, to test whether plaintiffs put forward viable claims for relief under the Takings Clause of the Fifth Amendment.

### B. Defendant's Motion to Dismiss Pursuant to RCFC 12(b)(6)

In the alternative, defendant moves to dismiss plaintiffs' case for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(6). Def.'s Mot. at 8–10. "Dismissal of a complaint under RCFC 12(b)(6) is appropriate when the plaintiff can prove no set of facts that would warrant the requested relief, when drawing all well-pleaded factual inferences in favor of the complainant." *Levine v. United States,* 453 F.3d 1348, 1350–51 (Fed.Cir.2006) (citing *Leider v. United States,* 301 F.3d 1290, 1295 (Fed.Cir. 2002)). For purposes of evaluating defendant's motion, the court "assume[s] all well-

ple[ ]d factual allegations in the complaint to be true and draw[s] all reasonable inferences in [plaintiffs'] favor." *Leider,* 301 F.3d at 1295.

### 1. Whether restrictions attendant to the CIP program constitute a taking of the book's value.

■ In support of their claim that the value of *Pitfall* has been taken by the Library's actions, plaintiffs aver that failure to include *Pitfall* in the CIP program cost plaintiffs the opportunity to receive, in effect, free publicity for their book. Pls.' Mot. at 17, 25. Participation in the PCN program confers some, but not all, of the benefits of the CIP program. Importantly for plaintiffs, a book's bibliographic data is not distributed by the Library to libraries and book vendors if the book is not included in the CIP program. The upshot, plaintiffs claim, is that libraries will be unlikely to purchase *Pitfall* for their collections, and the book will not be made widely available to the public through book vendors. Pls.' Mot. at 17. Additionally, plaintiffs claim that books that are not in the CIP program are not ordinarily made the subject of book reviews, which serve as an additional source of publicity for a book. *Id.* As a result, Mr. Tsitrin asserts that plaintiffs have failed to gain over 100,000 sales of the book, which he avers translates into net profits of approximately $500,000. *See* Pls.' App. tab A at 10–11.

The government contends that the CIP program is "simply a cataloging program." Defendant's Reply to Plaintiffs' Response to Defendant's Motion to Dismiss ("Def.'s Reply") at 3. The government further avers that plaintiffs have lost nothing as a result of the fact that *Pitfall* was not included in the CIP program: "the CIP program has not assumed use or control of plaintiffs' work; has not assumed authorship or ownership of plaintiffs' work; has not restricted plaintiffs' use of their work; has not reaped economic benefit from plaintiffs' work; and has not infringed upon plaintiffs' use of the book." *Id.*

To the extent that libraries and book vendors make purchasing decisions based upon distribution of a book's bibliographic data through the CIP program, books which are

included in the program will have an advantage over those books which are not included. However, while the circulation of bibliographic data that some books receive as an incident to inclusion in the CIP program may be beneficial to the sales of these books, it does not prevent other authors and publishers from endeavoring to market their own books. Moreover, Mr. Tsitrin had an unfettered ability to pursue a relationship with a publisher that would have qualified for participation in the CIP program, as evidenced by his efforts and those of his agent to obtain publication through an established publishing house. Alternatively, as indicated by government counsel during the hearing of June 30, 2006, Overview Books could have published three books by different authors that would have qualified its future publications for inclusion in the CIP program. *See* Hr'g Tr. 35:1–4. In fact, it appears that a publisher need only show that it *intends* to publish books by three different authors to qualify for the program.[4] Overall, plaintiffs do not show that the existence of the CIP Program harms an author who seeks publication of his work. In short, an author or publisher whose book is not included in the CIP program does not have his interest in a work reduced to a "token interest," as plaintiffs claim. *See* Pls.' Mot. at 26 (citing *Palazzolo v. Rhode Island*, 533 U.S. 606, 631, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001)).

The restrictions attendant to the CIP program also do not constitute a regulatory taking of the value of the book under the analytical framework for partial regulatory takings set forth in *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (requiring an *ad hoc*, factual inquiry into (1) the character of the governmental action, (2) the economic impact of the action, and (3) the degree of interference with the reasonable investment-backed expectations of the property owner).[5] Respecting the character of the governmental action and the benefits to be derived therefrom, the stated purposes of the program's restrictions are to ensure that the publications included in the CIP program are those "most likely to be widely acquired by the nation's libraries," *supra*, at 39, and to conserve the limited resources available to support the CIP program. *Id.* Libraries save the time and expense of producing catalog records for these books and benefit by receiving bibliographic information about books they are most likely to acquire. The restrictions prevent the resources of the Library's CIP Division from being overwhelmed. As for the magnitude, character, and distribution of the burdens attendant to the restrictions, and the economic impact of the restrictions, to the extent that self-publishing authors and publishers which do not meet the three-author requirement are put at a disadvantage, numerous avenues are provided for these authors and publishers to overcome or circumvent the restrictions. Publishers of non-CIP listed books may still participate in the PCN program, or, alternatively, may take steps to bring themselves within the CIP program requirements. The CIP program also imposes no barrier to prevent authors from marketing their publications on their own. The CIP program might be viewed as a benefit to participants, but nonetheless the program does not burden non-participants' ability to derive economic benefits from their work. Finally, respecting the investment-backed expectations of an author of a book, plaintiffs contend that Mr. Tsitrin expected to benefit from a "[f]ree pre-publication worldwide advertising campaign" through the distribution of *Pitfall's* bibliographic information through the CIP pro-

---

4. The *CIP Publishers Manual* provides specific guidance for new publishers that wish to participate in the CIP program. *See* Cataloging in Publication Division, Library of Congress, *CIP Publishers Manual* 8 (2001). This publication states that "[n]ew publishers (i.e., publishers who have not yet published any works) may apply for participation in the CIP program, but initial application must include ... [e]vidence that the publisher is not self-publishing ... and evidence that the publisher *intends* to publish the works of more than one or two authors." *Id.* (emphasis added).

5. At the hearing held on June 30, 2006, counsel for plaintiffs declined to offer an analysis of the facts of this case in terms of the *Penn Central* factors for evaluating a partial regulatory taking, instead opting to contend that this case should be considered as a total taking, or virtually such. Hr'g Tr. 28:13–19.

gram. *See* Pls.' Mot. at 9. Any such expectation would have been unfounded in light of the criteria for inclusion in the program. On balance, viewing all of the evidence in a light most favorable to plaintiffs, the court cannot conclude that the Library's restrictions on participation in the CIP program constituted a regulatory taking.

### 2. Whether plaintiffs have a "right" to participate in CIP Program.

■ In addition to claiming a taking of the value of the book itself, plaintiffs contend that they have a right to participate in the CIP program and that the Library's denial of plaintiffs' request to include *Pitfall* in the CIP program constituted a taking of that right. Pls.' Mot. at 30–33. The first step in analyzing plaintiffs' claim is to determine whether plaintiffs had anything akin to a property right in the form of their alleged entitlement to participate in the CIP program.

The existence and nature of property rights in governmental benefits has been addressed extensively by the Supreme Court in the context of procedural due process protections of such rights. "To have a property interest in a benefit, a person . . . must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "Property interests . . . are not cre-

ated by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source." *Id.* Such a property interest can be created by state or federal law or upon the conferring of a benefit upon an individual. *See Mathews v. Eldridge*, 424 U.S. 319, 332–33, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Perry v. Sindermann*, 408 U.S. 593, 602, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents*, 408 U.S. at 576, 92 S.Ct. 2701 (citing *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)). Only after such a property interest has been established does it become subject to Constitutional protections. *See Mathews*, 424 U.S. at 332, 96 S.Ct. 893.[6]

In the case at hand, plaintiffs take the approach that by virtue of writing and publishing a book they have a vested right to participate in the CIP program. Plaintiffs, however, point to no statute or regulation that would entitle them to such participation. Rather, they merely assert that the program must accept publications from all authors because to do otherwise would be to abridge the First Amendment rights of plaintiffs and all others who are similarly situated. The Supreme Court has held on numerous occasions that the government may set conditions upon eligibility for conferral of a government benefit. *See, e.g., South Dakota v. Dole*, 483 U.S. 203, 206–08, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). For example, in *National Endowment for the Arts v. Finley*, 524 U.S. 569,

---

6. *Mathews, Sindermann* and *Roth* all involved allegations that claimants to a vested right in a government benefit were deprived of the benefit without procedural due process in violation of the Fifth or Fourteenth Amendments. The remedy sought in each case was equitable in nature (*e.g.*, requiring that a government agency provide more procedural safeguards before depriving plaintiff of a benefit). By contrast, plaintiffs in this case allege a taking of a vested property right and seek relief in the form of money damages. Jurisdictional consequences flow from the distinction between equitable relief sought for a due process violation and money damages resulting from a taking. *See United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Nonetheless, the "analysis of legislation under the Takings and Due Process Clauses is correlated to some extent." *Eastern Enters. v. Apfel*, 524 U.S. 498, 537, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (plurality) (citing

*Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986)). The potential overlap between takings and due process analyses is well-illustrated by the plurality opinion by Justice O'Connor and the concurring opinion of Justice Kennedy in *Eastern Enterprises*. *Compare* 524 U.S. at 522–38, 118 S.Ct. 2131 (plurality) (concluding that imposition of a retroactive liability should be analyzed as a taking), *with* 524 U.S. at 539–50, 118 S.Ct. 2131 (Kennedy, J., concurring) (concluding that a due process analysis is preferable). *See also Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 540–48, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005) (contrasting the "substantially advances" test used for due process analysis with the "doctrine of unconstitutional conditions" that is applied when property is taken for a public use in exchange for a discretionary benefit that has little or no relationship to the property).

118 S.Ct. 2168, 141 L.Ed.2d 500 (1998), the Court found that Congress could condition the award of competitively-awarded grants such that "artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." 524 U.S. at 576, 118 S.Ct. 2168 (quoting 20 U.S.C. § 954(d)). In setting conditions upon the conferral of a governmental benefit, the government may not impose conditions that would constitute a violation of an individual's constitutional rights if imposed by the government directly. Notably, " 'the government may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech even if he has no entitlement to that benefit.' " *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* — U.S. —, —, 126 S.Ct. 1297, 1307, 164 L.Ed.2d 156 (2006) (quoting *United States v. American Library Assn.,* 539 U.S. 194, 210, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003), and *Board of Comm'rs, Wabaunsee County v. Umbehr,* 518 U.S. 668, 674, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996)).

Plaintiffs argue that, through the CIP program, the Library engages in value judgments about the relative worth or importance of different works by determining which books are most likely to be acquired by libraries, and confers a benefit accordingly. Pls.' Mot. at 31–32. However, the CIP program's principal restrictions—on self-published works and publishers that have published fewer than three authors—are unrelated to the regulation of speech or expression. Those restrictions have a rational and reasonable relationship to a likelihood that a book may be widely purchased by libraries. In effect, the CIP program's requirements concern conduct, not speech. Authors and publishers are not required to adopt any position or viewpoint in their work to have such work processed through the CIP program, nor are they prevented from expressing themselves in any other way. *See Rumsfeld,* 126 S.Ct. at 1308 (concluding that a requirement that private educational institutions accepting federal funds must allow military recruiters access to recruiting facili-

ties is not equivalent to compelled speech). None of the conditions for participation in the CIP Program appears to have anything to do with conduct that would be considered expressive in nature. *See id.* at 1310–11 (excluding military recruiters from on-campus recruiting facilities not deemed to be "inherently expressive"). Indeed, in the case at hand, there is no indication that Mr. Tsitrin's decision not to use an established publisher was intended in any way to be expressive; it was done simply because no publisher to which the book was proposed agreed to publish the book.

There is also no evidence that the restrictions on the CIP program "result[ ] in the imposition of a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace.' " *Finley,* 524 U.S. at 587, 118 S.Ct. 2168 (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)). The limitations on allocating the Library's resources dedicated to the CIP program have no selectivity attendant to them whatsoever, considered in terms of ideas or subject matter. The program is a benefit to authors whose books are placed in the program but not a burden to the expressive rights of those whose books do not qualify. Nothing in the CIP program suggests that the Library is attempting to advance a certain viewpoint or idea.

Plaintiffs additionally imply that the Library, through the CIP program, has created a forum for speech from which they may not be excluded. *See* Pls.' Mot. at 31–32. This implied factual premise is mistaken. The CIP program was not created for the purpose of creating a forum for speech, but rather for the efficient cataloging of books most likely to be acquired by libraries. In this respect, the case at hand is distinguishable from *Rosenberger v. Rector and Visitors of the Univ. of Va.,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), in which a public university impermissibly excluded all publications with religious editorial viewpoints from funding by its Student Activities Fund. Importantly, in *Rosenberger* the University's announced policy was to make such funds available to *all* student organizations

that were "related to the educational purpose of the University," thereby creating a forum. *Id.* at 824, 830, 115 S.Ct. 2510. In the case at hand, the Library has not created such a forum for speech.

In sum, plaintiffs have not established a "legitimate claim of entitlement" to participate in the CIP program. *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. Therefore, the court need not engage in an analysis of an alleged taking of such an entitlement.

## CONCLUSION

Plaintiffs have failed to allege any set of facts which would entitle them to relief. Therefore, defendant's motion to dismiss is GRANTED pursuant to RCFC 12(b)(6), and plaintiffs' cross-motion for summary judgement is correspondingly DENIED. The Clerk is directed to enter judgment for defendant. No costs.

It is so ORDERED.

